Alfred PERRECA and Marie A. Perreca, Plaintiffs–Appellants,

v.

Michael GLUCK, individually and as Trustee and Administrator of Marketing Industries Group, Ltd. Employees' Retirement Plan, and Marketing Industries Group, Ltd., Defendants–Third–Party Plaintiffs–Appellees,

USI Retirement Systems, USI Retirement Services, Inc., Hogg Robinson Consulting Group, Inc., Innovative Retirement Concepts Co., and Pension Planning, Inc., Third–Party Defendants.

Docket No. 01–9123.

United States Court of Appeals, Second Circuit.

Argued: May 15, 2002.

Decided: July 8, 2002.

Arnold I. Rich, White Plains, NY, for Plaintiffs–Appellants.

Suzanne M. Halbardier, Barry, McTiernan & Moore, New York, NY, for Defendants–Appellees.

Before: CALABRESI, CABRANES, Circuit Judges, and MURTHA,* District Judge.

JOSÉ A. CABRANES, Circuit Judge:

We consider several questions in this case, including whether any genuine issues of material fact exist that preclude summary judgment on the calculation of plaintiffs' pension benefits; whether plaintiffs allege a viable claim of promissory estoppel; and whether plaintiffs are entitled to a lump sum payment of pension benefits.

Plaintiffs Alfred and Marie Perreca timely appeal from a judgment entered September 11, 2001 by the United States District Court for the Southern District of New York (Ronald L. Ellis, *Magistrate Judge*, with the consent of the parties pursuant to 28 U.S.C. § 636(c)) granting defendants' motion for summary judgment and denying plaintiffs' cross-motion for summary judgment.

Plaintiffs brought this action against defendants seeking money damages for their alleged violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, *et seq.* Am. Compl. at 1–41. Plaintiffs alleged that defendants wrongfully denied Alfred Perreca ("Perreca") the correct amount of his pension by calculating it from February 22, 1966 instead of August 1, 1959, despite the express terms of the retirement plan and in breach of a promise that defendant Michael Gluck ("Gluck") allegedly made to Perreca in 1965; denied Perreca the possibility of receiving his benefits in a lump sum payment, in an attempt to single him out for negative treatment; and caused Perreca to lose income from 1986 to 1997 because he retired early based on his expectation that he would receive larger pension benefits. *Id.*[1]

---

* The Honorable J. Garvan Murtha, Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

1. Before the District Court, defendants impleaded the third-party defendants named in this case on the theory that, as the company retained by defendants to manage and control the pension plan at issue in this action, the third-party defendants would be liable for contribution, damages, and/or indemnification in the event that defendants were held liable. Third Party Compl. at ¶¶ 6–25. However, plaintiffs do not appeal from that portion of the District Court's judgment that granted summary judgment to the third-party defendants. *See* Pls.' Notice of Appeal at 1.

In a September 7, 2001 Opinion & Order, the District Court granted defendants' motion for summary judgment; granted third-party defendants' cross-motion for summary judgment; and denied plaintiffs' cross-motion for summary judgment. *Perreca v. Gluck*, No. 99–1779, 2001 WL 1033547, at *1, *6 (S.D.N.Y. Sept.7, 2001). Addressing plaintiffs' claim that Perreca was denied the correct amount of his pension, the District Court first noted that there was no written documentation of defendant Gluck's alleged oral promise to Perreca in 1965 that Perreca's pension benefits would accrue from August 1, 1959—a promise which would have resulted in pension contributions for Perreca during a period (August 1, 1959 April 1966) when Perecca's employer, Sternberger Motor Corporation ("Sternberger"), had paid union benefits for Perecca. *See id.* at *5–6. In addition, the District Court observed that "[t]he language of the pension plan is quite clear ... that employees covered under a collective bargaining agreement are not covered under the pension plan. Thus, Perreca should have realized that such a promise would be illegal.... Any reliance on Perreca's part therefore was unreasonable." *Id.* at *6. The District Court also recalled that "the documents [Perreca] received [over the years] listing his expected benefits [as accruing from August 1, 1959] included the disclaimer that '[a]ctual benefits are, of course, subject to verification before any payments are authorized.'" *Id.*

On plaintiffs' claim for a lump sum payment, the District Court stated that "at the time of Perreca's retirement [on February 4, 1986], receiving pension benefits in a lump sum payment[ ] was subject to committee approval. When he retired, Perecca did not request a lump sum payment." *Id.* at *4. The Court noted that his request in 1997 for a lump sum payment "was based on a typographical error in a 1995 summary of the [pension] plan" for which "a replacement page correcting the typographical error" was mailed to employees. *Id.* Moreover, the District Court found that "even if Perreca had not received the corrected page in 1995, he cannot prevail because the error occurred nine years after he retired. He could not have relied upon it at the time of this retirement." *Id.* In addition, the District Court concluded that because Perreca "never sought lump sum payment of his benefits" until 1997, he could not claim that he had been "singled out in any way." *Id.*

With respect to plaintiffs' lost income claim, the District Court held that "Perreca may not recover under ERISA for 'extra contractual' damages." *Id.* at *6 (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)).

## I.

■ In reviewing a district court's decision on a motion for summary judgment, we construe all facts of record in a light most favorable to the non-moving party and identify any genuine issues of material fact that remain for adjudication. *See Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir.1996) (*per curiam*).

Perreca was employed as a truck driver by Sternberger beginning on August 1, 1959. (Perreca Aff. of 11/4/00, ¶ 7.) During his years as a truck driver for Sternberger, Perreca was a member of Local 138, International Brotherhood of Teamsters. Appellant's Br. at 6; (Perreca Dep. at 18–19). Sternberger paid into the union pension plan on behalf of Perreca during those years, pursuant to a collective bargaining agreement. (*See* Gluck Dep. at 30, 66.) When Perreca was promoted to Night Manager, he ceased being a member of the

Union. (*Id.* at 70; Perreca Aff. of 11/4/00, ¶ 22.) As discussed in Section II.B.1. *post,* the date of this promotion is in dispute, with Perreca insisting that it occurred in 1963 (Perreca Supplemental Aff. of 12/22/00, ¶¶ 2, 3, 6) and Gluck asserting that it occurred in 1965 or 1966 (Gluck Dep. at 67–69; Gluck Aff. ¶ 2). Union records indicate that Sternberger paid into the union pension on behalf of Perreca from August 1959 through April 1966. (Halbardier Aff., Ex. U at 9, 11.) Beginning in 1968, Perreca went on to hold several positions as an officer with Sternberger.[2] (Perreca Aff. of 11/4/00, ¶¶ 7–9.)

Sternberger first adopted a retirement plan and trust on behalf of its employees on December 6, 1965, with an effective date of January 1, 1965. (Perreca Aff. of 11/4/00, Ex. 1 ¶ 1.12, p. 18; Ex. 2 at 1.) This company pension plan was entitled the Sternberger Employees' Retirement Plan (the "Sternberger Plan" or the "Plan").[3] (*Id.*, Ex. 1 at 1.) Since the inception of the Sternberger Plan, Sternberger has used the same outside pension consulting firm, third-party defendant USI Retirement Systems, formerly known as Pension Planning Company. (*See* Gluck Dep. at 58–61.) Gluck has been a trustee of the Sternberger Plan since January 1, 1970 and a member of the Plan's Administrative Committee since approximately the same date. (*Id.* at 36, 48–51.) He became the sole member of the Plan's Administrative Committee in approximately 1989. (*Id.* at 47–48.)

Under the terms of the Plan as it existed in 1984, Sternberger could "modify or amend in whole or in part any or all of the provisions of [the] Plan." (Perreca Aff. of 11/4/00, Ex. 29 § 10.01.) The Plan also provided for lump sum payment upon retirement "[w]ith the approval of the [Administrative] Committee." (*Id.*, Ex. 29 at Ex. A–I ¶ 3(e).) In 1985, the "Lump Sum Option" provision was amended to inform Plan members that "since the basic purpose of the Plan is to provide a lifetime pension, the Committee will approve a lump sum payment only in unusual circumstances." (Halbardier Aff., Ex. L. at 4.) In 1989, the Plan was amended, making the lump sum payment option available to Plan members who "terminated employment after age 65 and ... completed at least 10 years of service." (Perreca Aff. of 11/4/00, Ex. 28 § 4.05(b).)

Perreca claims that sometime in 1965, Gluck, upon returning from a meeting with the pension consulting firm, advised Perreca that Perreca would be a member of the pension plan as of 1959, despite his having been a union member for several years beginning in 1959. Appellants' Br. at 7, 24; (*Id.*, ¶ 116). Gluck denies ever having this conversation with Perreca. (Gluck Aff. ¶ 2; Gluck Dep. at 365–66.) Moreover, Gluck maintains that Sternberger did not make any payments into the Sternberger Plan on Perreca's behalf while he was a union member because such payments

---

**2.** Effective January 1, 1977, Sternberger and certain of its affiliated companies became wholly owned subsidiaries of Agora Industries, Inc., a holding company that was incorporated in 1976. (Am. Compl. ¶ 11; Answer ¶ 11.) Agora changed its name to Marketing Industries Group, Ltd. on or about July 1, 1993. (Am. Compl. ¶ 14; Answer ¶ 14.) To avoid confusion, the company will be referred to as "Sternberger" throughout this opinion.

**3.** The title of the company pension plan was redesignated in 1984 as "Agora Industries, Inc. Employees' Retirement Plan" and again in 1993 as "Marketing Industries Group, Ltd. Employees' Retirement Plan" to reflect the company's name changes. (*See* Am. Compl. ¶¶ 11, 13, 14; Answer ¶¶ 11, 13, 14); *see also ante* note 2. To avoid confusion, the company pension plan will be referred to as the "Sternberger Plan" or the "Plan" throughout this opinion.

were prohibited by the terms of the Plan. (*Id.*); Appellees' Br. at 6.

In an annual statement of his projected Plan benefits dated July 1, 1984,[4] Perreca was advised that on March 1, 1997, after he had reached age sixty-five,[5] he would begin receiving monthly pension payments of $4,028. (Halbardier Aff., Ex. V.) In 1985, Perreca decided that he would retire, though he knew that he would not be entitled to pension benefit payments until he reached age sixty-five. (Perreca Dep. at 110, 131.) On February 4, 1986 (the day after Perreca turned fifty-four years old), Perreca indeed retired.[6] (*See* Halbardier Aff., Ex. X ¶¶ 1, 6B.)

On appeal, plaintiffs principally argue that under the express terms of the Sternberger Plan and Gluck's oral promise in 1965, Perreca is entitled to have his pension calculated from August 1, 1959 instead of February 22, 1966. Appellants' Br. at 9–31. They further contend that they are entitled to lump sum payment of Perreca's pension benefits under the terms of the 1984 version of the Plan that was in effect when Perreca retired in 1986. *Id.* at 43–56. Defendants' response, *see generally* Appellees' Br. at 9–19, mirrors the District Court's analysis, which is recounted above.

## II.

### A. STANDARD OF REVIEW

■ We review the grant of summary judgment *de novo. Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 77 (2d Cir.1996). Reversal is required if " 'there are any genuine factual issues that properly can be resolved only by a finder of fact

because they may reasonably be resolved in favor of either party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[Our] function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

### B. CALCULATION OF PERRECA'S PENSION BENEFITS

#### 1. A Genuine Issue of Material Fact Exists as to When Perreca Was Promoted to Night Manager, Thereby Automatically Terminating His Union Membership

■ The date that Perreca was promoted to Night Manager is a pivotal and disputed factual issue in this case.

On the date that Perreca was elevated to management, he would have (1) automatically ceased to be a member of the union—a fact that is conceded by both plaintiffs and defendants *(see* Perreca Aff. of 11/4/00, ¶ 22; Gluck Dep. at 70); (2) no longer been subject to the union's collective bargaining agreement (Perreca Aff. of 11/4/00, ¶ 22); and (3) become eligible to participate in the Sternberger Plan *(see* Perreca Aff. of 11/4/00, Ex. 1 §§ 1.12, 1.13, 2.1), under either plaintiffs' or defendants' interpretation of the Plan, which are discussed at Section II.B.2. *post.* Accordingly, determination of Perreca's promotion date will affect this case in two ways. First, under plaintiffs' interpretation of the express terms of the Sternberger Plan, if Perreca's membership in the union ended

---

**4.** This projected benefits statement is discussed more fully in Section II.B.3.b. *post.*

**5.** Perreca turned sixty-five years old on February 3, 1997. (*See* Perreca Aff. of 11/4/00, ¶ 124.)

**6.** When Perreca retired, he received, *inter alia,* $1,206,911 under a stock buy-out agreement with Sternberger. (Halbardier Aff., Ex. X ¶¶ 1, 6B.)

prior to January 1, 1965, the effective date of the Plan (Perreca Aff. of 11/4/00, Ex. 1 § 1.12), he is entitled to have his pension benefits calculated from August 1, 1959, the date that he became employed by Sternberger. Appellants' Br. at 9. Second, even if a jury were to find that under the express terms of the Plan, Perreca is not entitled to company pension benefits calculated from August 1, 1959, he still may be entitled to company pension benefits calculated from January 1, 1965 (the effective date of the Sternberger Plan), in contrast to the 1966 starting date asserted by defendants.

The date that Perreca was promoted to Night Manager is a disputed issue, with both parties submitting sworn testimony and written records to support their respective claims. Perreca swears in an affidavit that he was promoted to Night Manager at Sternberger in 1963. (Perreca Supplemental Aff. of 12/22/00, ¶¶ 2, 3, 6.) He recalls this with certainty because that was the year that his two sons became ill with respiratory infections, requiring Perreca to be more available to assist with their care. (*Id.* ¶¶ 2–6.) As a result, Perreca requested that Sternberger no longer assign him to driving routes out of town. (*Id.* ¶ 6.) In response, Sternberger promoted Perreca to Night Manager so that he could work in-house. (*Id.* ¶¶ 6–7.) To substantiate his claim that he was promoted in 1963, Perreca relies upon medical bills and receipts retained from his sons' treatments that bear dates from February through June 1963.[7] (*Id.* ¶¶ 2–6.) Perreca attaches this evidence to his affidavit in support of his claim. (*See id.,* Ex. 38 at 1–5.)

In turn, Gluck agrees that Perreca was promoted to Night Manager in response to his request to be assigned locally due to his sons' illnesses. (Gluck Dep. at 68.) However, on August 25, 1999, Gluck testified that the promotion occurred in 1966. (*Id.*) Later, in an affidavit dated December 1, 2000, he swore that Perreca was promoted in 1965. (Gluck Aff. ¶ 2.) Gluck offers no reason for his change of testimony and no reason as to why, over thirty years after the fact, 1965 or 1966 stands out in his mind as the year of Perreca's promotion. In addition, defendants have not produced Perreca's personnel and payroll records—despite plaintiffs' request—even though Gluck testified (1) that these records likely would reveal the date Perreca was promoted to Night Manager (Gluck Dep. at 71–72) and (2) that he was not aware of any of Sternberger's personnel files having been discarded (*id.* at 95). Rather, Gluck's December 1, 2000 affidavit claims that defendants "have not located any records from the 1950's or 1960's which relate to these topics." (Gluck Aff. ¶ 9.)

In place of the direct evidence that Perreca's employment records would provide, defendants point to union records indicating that Sternberger paid into the union pension plan on behalf of Perreca until April 1966 (Halbardier Aff., Ex. U at 9, 11). While defendants suggest that this indicates that Perreca was a union member until April 1966, it is also possible that, due to an administrative oversight, Sternberger (1) neglected to stop contributing to the union pension plan when Perreca was promoted years earlier and (2) as a result of this inaccurate bookkeeping, failed to pay into the Sternberger Plan on behalf of

---

7. In Perreca's November 4, 2000 affidavit, he alleged that he became Night Manager in 1964. (Perreca Aff. of 11/4/00, ¶¶ 7, 22, 30, 37; *see also* Perreca Supplemental Aff. of 12/22/00, ¶ 3.) However, upon locating and reviewing these medical bills and receipts, Perreca's recollection was refreshed, and he realized that the promotion was one year earlier. *Id.*

Perreca even though he was a member of the Plan. Moreover, even if we assume for the sake of argument that the union records accurately reflect that Perreca was a union member until April 1966, there then appears to be no explanation for the date asserted by defendants of February 22, 1966 as the starting date of Perecca's membership in the Sternberger Plan (*see* Halbardier Aff., Ex. Y). The absence of any objective support in the record to date for the February 22, 1966 starting date claimed by defendants is a factor that could be weighed by a jury, along with other admissible evidence, in determining the date that Perreca was promoted to Night Manager.

In light of the serious dispute over this important factual determination, the District Court's judgment is vacated with respect to the date from which company pension benefits should be calculated under the terms of the Sternberger Plan, and the cause is remanded to the District Court for trial on the issue of whether Perreca was promoted to Night Manager in 1963, as he contends—or for that matter, at any time prior to January 1, 1965, which was the effective date of the Sternberger Plan—or whether his union membership in fact continued until April 1966, as defendants insist.

### 2. Genuine Issues of Material Fact Exist Concerning the Proper Interpretation of the Terms of the Plan

Plaintiffs argue that "according to the plain language of the original Sternberger Plan, an employee who stopped being a union member before the Sternberger Plan came into existence is entitled to receive benefit service from the date the employee was hired." Appellants' Br. at 18. Plaintiffs contend that because Perreca was not a union member on the effective date of the Plan (January 1, 1965), he

is entitled to credit under the Plan starting from his first day of work on August 1, 1959. *Id.* at 6–7.

The Sternberger Plan defines the term "Employee," in relevant part, as "any person, excluding those *covered* under a collective bargaining agreement, regularly employed by an Employer [*i.e.,* Sternberger] and who receives Compensation from an Employer not as a pension, severance pay, retainer or a fee under contract." (Perreca Aff. of 11/4/00, Ex. 1 § 1.13 (emphasis added)). Plaintiffs contend that this definition excluded from Plan participation only persons who were *presently covered*—that is, covered as of the effective date of the Plan, which was January 1, 1965—under a union plan; otherwise the Sternberger Plan could have easily stated that persons *"presently or previously* covered" under a union plan were excluded. Appellants' Br. at 19 (emphasis added). Accordingly, under plaintiffs' interpretation, since Perreca was not covered by a union plan on January 1, 1965, he was not excluded as an "Employee" from participating in the Plan. *Id.*

Plaintiffs argue that the "Exclusion of Multiple Benefits" provision of the Sternberger Plan "also does not exclude persons as 'Employees' who ceased their union membership prior to" January 1, 1965. *Id.* That provision states, in relevant part, that "[m]embership hereunder (or eligibility therefor, if an Employee has not become a Member) of any Employee terminates when his Employer is obligated to contribute to any other plan, involving pensions or other deferred compensation negotiated with a union which represents such Employee in an appropriate bargaining unit." (Perreca Aff. of 11/4/00, Ex. 1 § 2.4.) Thus, eligibility and membership were not terminated by the "Exclusion of Multiple Benefits" provision for an employee like Perreca who was a union member *before* the

Sternberger Plan came into existence, because the Employer was not, as of the effective date of the Plan (January 1, 1965), "obligated to contribute" to a union pension plan for that person. Appellants' Br. at 20.

Plaintiffs argue that Perreca also met the eligibility requirements articulated in the Plan, which states that "[e]ach Employee on the Effective Date who has not then attained his sixty-fifth (65th) birthday shall be eligible for membership on that date" (Perreca Aff. of 11/4/00, Ex. 1 § 2.1). Appellants' Br. at 21. As an Employee who had not attained his sixty-fifth birthday on January 1, 1965, Perreca, plaintiffs assert, was eligible for membership on that date. *Id.* In addition, plaintiffs explain how Perreca also met the sixty-day deadline for written application for membership that comes to pass either "sixty (60) days after the date [that an employee] becomes eligible to be a Member, or sixty (60) days after he receives notice of his eligibility from the [Administrative] Committee, whichever shall be later...." (Perreca Aff. of 11/4/00, Ex. 1 § 2.2); Appellants' Br. at 21. For "when [.] Perreca received a form from Sternberger [ ] for membership in the Sternberger Plan, he immediately completed and returned it to [Sternberger], as [the form] requested, and he became a Member of the Sternberger Plan." *Id.* at 21–22; (Perreca Aff. of 11/4/00, ¶ 33). They further explain that upon application approval, membership was effective as of the date of eligibility, which, for Perreca, was the Plan's effective date of January 1, 1965. Appellants' Br. at 21–22; (Perreca Aff. of 11/4/00, Ex. 1 § 2.2).

Finally, plaintiffs point to the "Prior Service" provision of the Plan, which states that "[e]very Employee who becomes a Member of the Plan as of the Effective Date shall receive credited Prior Service for the years and completed months of employment from *his first date of hiring* by an Employer or predecessor to the Effective Date" (Perreca Aff. of 11/4/00, Ex. 1 § 3.1 (emphasis added)). Appellants' Br. at 22. They argue that "since Perreca became a member of the Sternberger Plan as of the Effective Date of January 1, 1965, he was entitled to receive credited Prior Service from August 1, 1959, the date of his hiring." *Id.*

We are mindful that, "[a]s a general matter, unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning," *Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 149 (2d Cir.1999); *see also Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2d Cir.2002) ("This Court will review the [ERISA] Plan as a whole, giving terms their plain meanings."). In addition, absent evidence indicating the intention of the parties, any ambiguity in the language used in an ERISA plan should be construed against the interests of the party that drafted the language. *See O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.,* 37 F.3d 55, 61 (2d Cir.1994) (In an ERISA case, "[t]he rule is that when one party is responsible for the drafting of an instrument, absent evidence indicating the intention of the parties, any ambiguity will be resolved against the drafter." (internal quotation marks omitted)); *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 443 (2d Cir.1995) (relying on same quotation); *Masella v. Blue Cross & Blue Shield of Conn., Inc.,* 936 F.2d 98, 107 (2d Cir.1991) (noting that when courts conduct *de novo* review of an interpretation under an ERISA insurance plan, ambiguities should be construed against the insurer); *Fay,* 287 F.3d at 104 ("Where there are ambiguities in an ERISA plan that this Court is reviewing *de novo,* those ambiguities are construed in favor of the plan beneficia-

ry."). In light of these settled principles of contract interpretation, the plain language of the Plan could be understood to permit plaintiffs' claim for pension benefits coverage beginning August 1, 1959, as long as Perreca was not covered by a collective bargaining agreement on January 1, 1965.

■ However, it is also a "cardinal principle of contract construction[ ] that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *see also Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir.1994) (noting the well-established principle of contract construction that "all provisions of a contract be read together as a harmonious whole, if possible"). Thus, defendants argue that plaintiffs' interpretation "runs afoul of the unambiguous language of the Plan excluding 'multiple benefits.'" Appellees' Br. at 11. As defendants point out, Perreca's interpretation "would require the Company to make double payments for any employee who had previously been a union member, something not *intended* under the Plan." *Id.* (emphasis added).

When one reads the Plan as a whole, defendants' argument casts doubt on the asserted plain meaning of the Plan because the intent or purpose of the "Exclusion of Multiple Benefits" provision clearly was to protect the Employer from having to pay into two pension plans (a union plan and the Sternberger Plan) for the same set of years for any given employee. *See O'Neil,* 37 F.3d at 61 (noting that ambiguity in an ERISA plan is construed against the drafter *only* absent evidence indicating the

intention of the parties); *Pagan,* 52 F.3d at 443 (same). The fact that membership in the Plan terminates for any employee who becomes covered by a union pension plan during their employment (*see* Perreca Aff. of 11/4/00, Ex. 1 § 2.4) is strong evidence of this purpose.

It is thus clear that we are faced with a disputed issue of fact over the proper interpretation of the Plan by virtue of the apparent conflict between the "plain meaning" interpretation offered by plaintiffs and the evidence of the intent factor pressed by defendants. *See Fay,* 287 F.3d at 104 ("Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire ... agreement.... Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." (internal quotation marks and citation omitted)).

Accordingly, the District Court's judgment is vacated with respect to the date from which company pension benefits should be calculated under the terms of the Sternberger Plan, and the cause is remanded to the District Court for trial on this issue as well.[8] *See Thompson v. Gjivoje,* 896 F.2d 716, 721 (2d Cir.1990) ("Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate.").

### 3. The Alleged Promise to Perreca

#### a. Gluck's Alleged Oral Promise

■ Plaintiffs' claim that, apart from the express terms of the Sternberger Plan,

---

**8.** We note that it is possible that the "Exclusion of Multiple Benefits" provision is intended to prohibit the receipt by an employee of multiple benefits, rather than the making by

the employer of multiple contributions. But that, of course, is simply another question that the jury may decide in interpreting the Plan.

Gluck orally promised Perreca in 1965 that August 1, 1959 would be the starting date from which Perreca's company pension benefits would accrue. Plaintiffs rely on this alleged oral promise as the basis for their claim of promissory estoppel. However, regardless of the accuracy of this allegation, plaintiffs' claim fails because oral promises are unenforceable under ERISA and therefore cannot vary the terms of an ERISA plan. *Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 7, 10 (2d Cir.1992). As we observed in *Smith* when we rejected a plaintiff's claim that he had been orally promised additional benefits to supplement his employer's ERISA plan,

> ERISA explicitly provides, in section 402(a), that all agreements relating to pension benefits must be in writing. ERISA § 402(a), 29 U.S.C. § 1102(a)(1) ("Every employee benefit plan shall be established and maintained pursuant to a written instrument[.]"). The writing requirement protects employees from having their benefits eroded by oral modifications to the plan.

> Furthermore, the writing requirement protects the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to such under the express terms of the plan. The statutory language of § 1102(a)(1) is clear and concise and must be enforced as written. To hold otherwise would not only thwart congressional purpose and intent, but would afford less protection to employees and their beneficiaries.

*Id.* at 10 (quoting *Cefalu v. B.F. Goodrich Co.,* 871 F.2d 1290, 1296 (5th Cir.1989)).

Accordingly, since Perreca may not, as a matter of law, rely upon an oral promise to modify the terms of an ERISA plan, we affirm the District Court's judgment to the extent that it denied plaintiffs' claim to

calculate pension benefits from August 1, 1959 on the basis of Gluck's alleged oral promise. On remand, the success of plaintiffs' action at trial will depend upon their claim that the express language of the Plan permits Perreca's pension benefits to be calculated from August 1, 1959.

**b. Projected Benefits Statements Received by Perreca**

■ Perreca points to an "Annual Statement of Benefits" dated July 1, 1984 that calculated his Plan benefits from August 1, 1959 (Halbardier Aff., Ex. V) as evidence that he indeed was promised that his Sternberger Plan benefits would accrue from August 1, 1959. *See* Appellants' Br. at 28–29. This document, which was "prepared for" Perreca, stated, *inter alia,* that as of July 1, 1984, "Your accrued pension under the Retirement Plan is $4,028 a month to start on March 1, 1997 at age 65. You have 25 years of service credited toward vesting.... Your date of employment is August 1, 1959." (Halbardier Aff., Ex. V.) At the bottom of this document, a statement in capital letters directed the recipient to consult the reverse side of the paper. This statement read, "PLEASE SEE THE REVERSE SIDE FOR NOTES REGARDING THE PREPARATION OF THIS STATEMENT AND AN EXPLANATION OF ACCRUED AND VESTED BENEFITS." *Id.* On the reverse side of the paper, there was a note that read in pertinent part, "Every effort was made to avoid errors in the preparation of this statement. However, you will appreciate that errors may have occurred and that factors and assumptions used for projecting benefits may be subject to change. Actual benefits are, of course, subject to verification before any payments are authorized." (*Id.,* Ex. W.)

To the extent that plaintiffs suggest that this statement of projected benefits alone

constituted a promise supporting their claim of promissory estoppel, we reject their claim. In light of the prominent disclaimer printed on the statement that specifically cautioned Perreca that "[a]ctual benefits are . . . subject to verification before any payments are authorized," (*id.*), the statement of projected benefits cannot, in the circumstances of this case, reasonably be construed as a promise concerning the precise amount of benefits accrued. The disclaimer was clearly printed on the statement prepared for Perreca and notified him that actual benefits were subject to verification before any payments would be authorized.

## C. LUMP SUM PAYMENT

### 1. Do the Terms of the 1984 Version of the Plan, Including the Lump Sum Option, Govern Perreca's Pension Benefits?

In January 1997, Perreca requested for the first time lump sum payment of his pension benefits. (*See* Perreca Aff. of 11/4/00, ¶ 73); Appellants' Br. at 47, 49, 50. Plaintiffs assert that the lump sum payment option should be available to them because that option was available under the terms of the 1984 version of the Sternberger Plan, which plaintiffs contend govern Perreca's company pension benefits since that was the plan in effect at the time Perreca retired on February 4, 1986.[9] Plaintiffs point to the Preambles of the 1984 and 1989 versions of the Plan to support the proposition that the 1984 version of the Plan governs Perreca's company pension benefits, as both of those Preambles state, "With respect to any Employee or Member who had retired . . . prior to the effective date of any change in the Plan, all rights and any benefits pay-

able shall continue to be determined in accordance with the provisions of the Plan as in effect on the date of retirement. . . ." (Perreca Aff. of 11/4/00, Ex. 28 at 4, Ex. 29 at 3.) Moreover, defendants conceded at oral argument before us that Perreca's pension benefits are governed by the terms of the 1984 version of the Sternberger Plan that was in effect when Perreca retired on February 4, 1986. Accordingly, the parties here have effectively stipulated that the terms of the 1984 version of the Plan, as amended in 1985, govern Perreca's company pension benefits.

The 1984 version of the Sternberger Plan permits a member to elect certain pension payment options, including the "Lump Sum Option." (*Id.*, Ex. 29 at Ex. A–I ¶¶ 1–3.) If a member selects the "Lump Sum Option," then, "[w]ith the approval of the [Administrative] Committee [of the Plan], a lump sum equal to the Actuarial Value of the Member's Standard Pension shall be paid to the Retired Member upon retirement." (*Id.*, Ex. 29 at Ex. A–I ¶ 3(e).) Similarly, the 1985 Summary Plan Description, which reflects amendments to the Plan effective as of January 1, 1985, states, "With Committee approval you may be granted a lump sum upon retirement. (But, since the basic purpose of the Plan is to provide a lifetime pension, the Committee will approve a lump sum payment only in unusual circumstances.)." (Halbardier Aff., Ex. L at 4.)

### 2. Did Perreca Timely Request the Lump Sum Option?

 Perreca concedes that he never sought committee approval for a lump sum payment at the time that he retired in 1986. *See* Appellants' Br. at 47. Howev-

---

9. Amendments to the 1984 version of the Plan that became effective as of January 1, 1985 also necessarily govern the terms of Perreca's

retirement, since those amendments became effective before Perreca retired on February 4, 1986. (*See* Halbardier Aff., Ex. L at 2–4.)

er, plaintiffs assert that under the terms of the "Election Procedure" provision of the 1984 version of the Plan, Perreca was entitled to elect a lump sum on or prior to March 1, 1997. *Id.* at 49. That provision states, in relevant part, that "[a] Member may elect an option by filing a Prescribed Form with the Committee on any date which is: ... (b) less than one year prior to the Pension Conversion Date, provided the Member furnishes proof of good health satisfactory to the Committee." (Perreca Aff. of 11/4/00, Ex. 29 at Ex. A–I ¶ 2.) The Plan defines "Pension Conversion Date" as "the earlier of a Member's Pension Commencement Date or his Normal Retirement Date." (*Id.*, Ex. 29 § 1.30(g).) The "Pension Commencement Date" is "the first day of the month as of which Pension payments commence" (*id.,* Ex. 29 § 1.30(f)), which for Perreca was March 1, 1997 (*id.*, Ex. 19 at 1, Ex. 34). The "Normal Retirement Date" is "the first day of the month coinciding with or next following the Member's 65th birthday" (*id.*, Ex. 29 § 1.28), which for Perreca was also March 1, 1997 since he turned sixty-five years old on February 3, 1997 (*see id.* ¶ 124); Appellants' Br. at 50.

Accordingly, plaintiffs' claim that Perreca was entitled to elect a lump sum on or prior to March 1, 1997 is confirmed by the terms of the 1984 version of the Plan. Thus, Perreca's first-time request to Sternberger in January 1997 for a lump sum payment of his pension benefits (*see* Perreca Aff. of 11/4/00, ¶ 73); Appellants' Br. at 47, 49, 50, was timely under the 1984 version of the Sternberger Plan.

### 3. Is Perreca Subject to the "Committee Approval" Requirement of the Lump Sum Option as Stated in the 1984 Plan?

 As indicated above in Section II. C.1., the "Lump Sum Option" provision of the 1984 version of the Plan states that approval of the Administrative Committee of the Plan is required before pension benefits may be paid in a lump sum to a retired member. (Perreca Aff. of 11/4/00, Ex. 29 at Ex. A–I ¶ 3(e).) However, plaintiffs assert that under the Tax Reform Act of 1986, the "committee approval" requirement in the 1984 version of the Plan was unlawful by the time that Perreca requested a lump sum payment of his pension benefits in January 1997, thereby voiding retroactively the "committee approval" requirement in the 1984 version of the Plan and entitling plaintiffs to payment of the lump sum without limitation. *See* Appellants' Br. at 51–52. In contrast, defendants argue that

> Perreca cites no cases to support his argument that he can simply change the plain language of the 1984 Plan. If Perreca's retirement is governed by the 1984 Plan which was legal at the time he retired, he cannot recover because he did not seek Committee approval and none was granted. If he seeks it under any later Plan, he is not entitled to the benefit because he did not retire at age 65.

Appellees' Br. at 17.

Plaintiffs are incorrect in attributing the ban on an "employer discretion" requirement for a lump sum payment option to the Tax Reform Act of 1986. Rather, that prohibition was established by Treasury Regulation § 1.411(d)–4, which was created to "reflect changes made by the Retirement Equity Act of 1984" ("Retirement Equity Act") and was intended to "conform the regulations to section 301 of the Retirement Equity Act." Limitations on Alternative Benefits, 51 Fed.Reg. 3798 (proposed January 30, 1986) (codified at 26 C.F.R. pt. 1); *see also* Retirement Equity Act of 1984, Pub.L. No. 98–397, tit. III, § 301, 98 Stat. 1426, 1450–51. Section 301

of the Retirement Equity Act amended the so-called "anti-cutback" rules of ERISA § 204(g), 29 U.S.C. § 1054(g), and Internal Revenue Code ("IRC") § 411(d)(6), 26 U.S.C. § 411(d)(6), that prohibit amendments to pension plans which diminish the accrued benefits of the participants. *See* Retirement Equity Act, § 301, 98 Stat. at 1450. ERISA § 204(g), 29 U.S.C. § 1054(g), provides in pertinent part,

**(g) Decrease of accrued benefits through amendment of plan**

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

. . .

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. . . . The Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan amendment [eliminating an optional form of benefit].

ERISA § 204(g), 29 U.S.C. § 1054(g). Similarly, IRC § 411(d)(6), 26 U.S.C. § 411(d)(6), provides in relevant part,

**(6) Accrued benefit not to be decreased by amendment.—**

(A) **In general.**—A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan, other than an amendment described in section

412(c)(8), or section 4281 of the Employee Retirement Income Security Act of 1974.

(B) **Treatment of certain plan amendments.**—For purposes of subparagraph (A), a plan amendment which has the effect of—

. . .

(ii) eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

IRC § 411(d)(6), 26 U.S.C. § 411(d)(6). Thus, the "anti-cutback" provisions found in ERISA and in IRC prohibit the same conduct.

Treasury Regulation § 1.411(d)–4, A–4(a) was adopted in order to effectuate these "anti-cutback" principles and states in relevant part,

[A pension] plan that permits the employer,[10] either directly or indirectly, through the exercise of discretion, to deny a participant a section 411(d)(6) protected benefit provided under the plan for which the participant is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6).

*Id.* (footnote added). In other words, a pension plan may not contain a provision that grants the employer discretion to deny a protected, accrued benefit—such as an optional form of benefit, which includes lump sum payments, *see* Treas. Reg. § 1.411(d)–4, A 1(b)—if the participating employee is otherwise eligible under the plan. *See* Treas. Reg. § 1.411(d)–4, A–4(a). Accordingly, plaintiffs are correct in asserting that the "committee approval" requirement of the "Lump Sum Option"

10. "The term employer includes plan administrator ... [and] trustee. . . ." Treas. Reg. § 1.411(d)–4, A–5.

provision in the 1984 version of the Stern-berger Plan is unlawful.

Because plaintiffs' action is one for retirement benefits pursuant to the civil enforcement provision of ERISA, 29 U.S.C. § 1132—as opposed to an action concerning disqualification of the Sternberger Plan for tax purposes—our analysis of Treasury Regulation § 1.411(d)–4 is guided by the ERISA "anti-cutback" provision.[11] As a practical matter, however, this is a distinction without a difference, since the ERISA and IRC "anti-cutback" provisions prohibit the same conduct and Treasury Regulation § 1.411(d)–4 enforces both provisions.

■ Treasury Regulation § 1.411(d)–4, A–8 governs rehabilitation of a previously existing ERISA plan that contains an "employer discretion" provision controlling the availability of a lump sum payment option, such as the 1984 version of the Sternberger Plan at issue in this case. To ease the impact of ERISA's "anti-cutback" prohibition, the regulation provides for "transitional alternatives" that work an exception to ERISA's "anti-cutback" ban by permitting the elimination or reduction of accrued benefits when specific regulatory requirements are satisfied, Treas. Reg. § 1.411(d)–4, A–8(b), (c), (d). Treasury Regulation § 1.411(d)–4, A–8(b) states in relevant part,

If the availability of an optional form[ ] of benefit ... under an existing plan [12] is conditioned on the exercise of employer discretion, the plan must be amended either to eliminate the optional form of benefit, ... to make such benefit avail-

able to all participants without limitation, or to apply objective and nondiscriminatory conditions to the availability of the optional form of benefit. . . .

*Id.* (footnote added). This regulation requires, then, that a plan administrator "must" eliminate any "employer discretion" requirement in an existing plan by (1) eliminating the optional form of benefit; (2) making the optional form of benefit available to all without limitation; or (3) applying objective, nondiscriminatory criteria in determining its availability. *Id.* The regulation goes on to state that the plan sponsor must select one of these alternatives on or before the "applicable effective date for the plan," as determined by Treasury Regulation § 1.411(d)–4, A–9, and then operate the plan in accordance with that selection. Treas. Reg. § 1.411(d)–4, A–8(c)(1). For an "existing noncollectively bargained" plan—that is, a plan that is not a product of collective bargaining, such as the one at issue in this case—the "applicable effective date" by which selection of one of the alternatives must be made is "the first day of the first plan year commencing on or after January 1, 1989," Treas. Reg. § 1.411(d)–4, A–9(c)(2). "A plan amendment conforming the plan to the particular alternative selected ... must [then] be adopted within the time period permitted for amending plans in order to meet the requirements of section 410(b) as amended by the [Tax Reform Act of 1986]." Treas. Reg. § 1.411(d)–4, A–8(c)(2). Incidentally, the deadline for amending pension plans to comply with changes in the Tax Reform

---

**11.** As indicated in the statutory excerpt quoted above, ERISA § 204(g)(2), 29 U.S.C. § 1054(g)(2), makes Treasury regulations applicable to the ERISA "anti-cutback" provision by stating that "[t]he Secretary of the Treasury may by regulations provide that this subparagraph shall not apply to a plan

amendment [eliminating an optional form of benefit]." *Id.*

**12.** "Plans ... that are both adopted and in effect prior to August 1, 1986, are 'existing plans' for purposes of this section." Treas. Reg. § 1.411(d)–4, A–9(c)(1).

Act is also "the first plan year beginning on or after January 1, 1989." Tax Reform Act, § 1140, 100 Stat at 2489. "Such conforming amendment must be consistent with the sponsor's selection as reflected in plan practice during the period from the effective date to the date the amendment is adopted." Treas. Reg. § 1.411(d)–4, A–8(c)(2). In other words, the amendment must be consistent with the alternative practice that was selected and in operation by "the first day of the first plan year commencing on or after January 1, 1989" until the date the amendment is adopted, which must also occur by the time of "the first plan year beginning on or after January 1, 1989." *See id.;* Treas. Reg. § 1.411(d)–4, A–9(c)(2); Tax Reform Act, § 1140, 100 Stat at 2489.

In the instant case, the 1984 version of the Sternberger Plan states in relevant part that the " 'Plan Year' means the 12–month period beginning on the Amendment Date, or any 12–month period beginning on the anniversary of said date in any subsequent year during which this Plan shall be in effect." (Perreca Aff. of 11/4/00, Ex. 29 § 1.34.) The "Amendment Date" is defined as "July 1, 1984." *(Id.,* Ex. 29 § 1.04.) Accordingly, the "applicable effective date" by which Sternberger was required to select an alternative to the "employer discretion" requirement was July 1, 1989, as that was "the first day of the first plan year commencing on or after January 1, 1989." *See* Treas. Reg. §§ 1.411(d)–4, A–8(c)(1), A–9(c)(2). Similarly, Sternberger was required to amend the Plan by July 1, 1989—"the first plan year beginning on or after January 1, 1989"—in a manner consistent with the alternative that it had selected. *See* Treas. Reg. § 1.411(d)–4, A–8(c)(2); Tax Reform Act, § 1140, 100 Stat at 2489.

As the record indicates, Sternberger officially amended and restated the Plan effective July 1, 1989 to provide that the "Lump Sum Option" is available only if "the Member has terminated employment after age 65 and … has completed at least 10 Years of Service." (*See* Perreca Aff. of 11/4/00, Ex. 28 § 4.05(b).) In so doing, Sternberger fully complied with the requirements set forth in Treasury Regulation § 1.411(d)–4, A–8 for rehabilitating the 1984 version of the Sternberger Plan that contained an unlawful "employer discretion" element governing availability of the lump sum payment option. That is, through the amendment and restatement of the Plan in 1989, Sternberger simultaneously selected one of the transitional alternatives enumerated in Treasury Regulation § 1.411(d)–4, A–8(b) (namely, by applying objective and nondiscriminatory conditions to the availability of the lump sum payment option) by the applicable effective date of July 1, 1989, and amended the Plan in a manner consistent with that selection by the July 1, 1989 deadline for amendment by adopting objective, nondiscriminatory criteria to govern availability of the lump sum payment option (namely, (1) member terminated employment after age sixty-five and (2) member completed at least ten years of service). Consequently, the 1989 amendment and restatement of the Sternberger Plan qualified for the exception to the "anti-cutback" prohibition of ERISA provided in Treasury Regulation § 1.411(d)–4, A–8 to rehabilitate a pension plan that is unlawful by virtue of an "employer discretion" element governing availability of an optional form of benefit. By complying with Treasury Regulation § 1.411(d)–4, A–8, the 1989 amendment and restatement of the Plan lawfully decreased the accrued benefit of the lump sum payment option that was previously available under the 1984 version of the Plan by making availability of this benefit contingent upon satisfaction of objective, nondiscriminatory criteria—name-

ly, termination of employment after age sixty-five with at least ten years of completed service.

Applying these new and lawful criteria to determine plaintiffs' eligibility for lump sum payment, we hold that since Perreca was only fifty-four years old when he retired on February 4, 1986, plaintiffs are not eligible for the lump sum payment benefit. Accordingly, we affirm the District Court's judgment on the issue of lump sum payment.

### III.

To summarize our holdings: we hold that (1) a genuine issue of material fact exists as to when Perreca was promoted to Night Manager, thereby automatically terminating his union membership and qualifying him for membership in his employer's pension plan. Similarly, we conclude that (2) genuine issues of material fact exist concerning the proper interpretation of the terms of the employer's pension plan. We also hold that (3) regardless of the accuracy of Perreca's allegations concerning defendant Gluck's oral promise, plaintiffs' claim of promissory estoppel fails because oral promises are unenforceable under ERISA and therefore cannot vary the terms of an ERISA plan. *Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 7, 10 (2d Cir.1992). Moreover, we hold that (4) the projected benefits statement received by Perreca cannot be construed as a promise concerning the precise amount of benefits accrued, because a clear disclaimer was printed on the document notifying Perreca that actual benefits were subject to verification before any payments would be authorized.

Accordingly, (5) we vacate the District Court's judgment with respect to the date from which company pension benefits should be calculated under the terms of the employer's pension plan and remand the cause to the District Court for trial on the two disputed issues of fact. However, (6) because Perreca may not, as a matter of law, rely upon an oral promise to modify the terms of an ERISA plan, we affirm that portion of the District Court's judgment that denied plaintiffs' claim to calculate pension benefits from August 1, 1959 on the basis of defendant Gluck's alleged oral promise. On remand, the success of plaintiffs' action at trial will depend upon whether the express language of the employer pension plan permits Perreca's pension benefits to be calculated from August 1, 1959 or, alternatively, from January 1, 1965.

With respect to plaintiffs' request for lump sum payment of company pension benefits, we affirm the District Court's judgment and hold (7) that the terms of the 1984 version of the company pension plan govern Perreca's retirement benefits; (8) that Perreca timely requested lump sum payment; and (9) that the 1989 amendment and restatement of the Sternberger Plan qualified for the exception to the "anti-cutback" prohibition of ERISA provided in Treasury Regulation § 1.411(d)–4, A–8 to rehabilitate a pension plan that is unlawful by virtue of an "employer discretion" element governing availability of an optional form of benefit. (10) By complying with Treasury Regulation § 1.411(d)–4, A–8, the 1989 amendment and restatement of the Plan lawfully decreased the accrued benefit of the lump sum payment option that was previously available under the 1984 version of the Plan by making availability of this benefit contingent upon satisfaction of objective, nondiscriminatory criteria—namely, termination of employment after age sixty-five with at least ten years of completed service. (11) Since Perreca was only fifty-four years old when he retired on February 4, 1986, plaintiffs are not eligible for

the lump sum payment benefit under the criteria established in the controlling 1989 amendment and restatement of the Plan.

The judgment of the District Court granting defendants' motion for summary judgment and denying plaintiffs' cross-motion for summary judgment is thus vacated in part and affirmed in part, and the cause is remanded with respect to the calculation of benefits; the judgment is affirmed with respect to the question of lump sum payment.

Costs to plaintiffs.