### In re WORLDCOM, INC. ERISA LITIGATION

**This Document Relates to:**

**ALL ACTIONS**

No. 02 Civ.4816DLC.

United States District Court, S.D. New York.

Feb. 1, 2005.

---

Lynn Lincoln Sarko, Gary A. Gotto, Ron Kilgard, Juli Desper, Tana Lin, Keller, Rohrback, LLP, Seattle, Washington, for Plaintiffs.

Jeffrey Lewis Lewis, Feinberg, Renaker & Jackson, P.C., Oakland, California, for Plaintiffs.

Edwin J. Mills, Stull, Stull & Brody, New York, New York, for Plaintiffs.

William J. Kilberg, Paul Blankenstein, Antoinette DeCamp, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Defendant Merrill Lynch Trust Company FSB.

*OPINION & ORDER*

COTE, District Judge.

This Opinion addresses the circumstances in which a directed trustee of a 401(k) plan may be liable under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for its failure to refuse on its own initiative to invest employee funds in the company's stock. Because plaintiffs have not shown that the trustee had non-public information regarding the company's stock that would warrant the trustee taking such an extraordinary action, and because the plaintiffs have not shown that the unusual circumstances that would otherwise require that action existed, the trustee's motion for summary judgment is granted.

## BACKGROUND

Following the collapse of WorldCom, Inc. ("WorldCom"), this consolidated class action was brought by WorldCom employees who invested in WorldCom stock through the WorldCom 401(k) Salary Savings Plan (the "Plan").[1] Litigation in the aftermath of WorldCom's collapse revolves around accusations that the company disseminated materially false and misleading information about the company's financial health, using illegitimate accounting techniques in order to hide expenses and inflate reported earnings to meet increasing-

---

1. Litigation brought under the federal securities laws is also before this Court and has been consolidated under the caption *In re* *WorldCom, Inc. Securities Litigation ("Securities Litigation").*

ly unrealistic earnings projections. On June 25, 2002, WorldCom admitted that it had improperly treated over $3.8 billion in ordinary costs as capital expenditures, and consequently would have to restate its publicly-reported financial results for 2001 and the first quarter of 2002. WorldCom filed for bankruptcy on July 21, 2002. Criminal and civil litigation proliferated, with guilty pleas by WorldCom executives to violations of the securities laws, state government and congressional investigations, and numerous lawsuits against WorldCom officers, directors, its auditor, underwriting syndicates, and principal outside analyst.[2]

The Judicial Panel on Multi–District Litigation has transferred the civil litigation concerning WorldCom pending in federal court to this Court. An Order of September 18, 2002 consolidated two actions brought pursuant to ERISA under the caption *In re WorldCom, Inc. ERISA Litigation*, 2002 WL 31095170 (*"ERISA Litigation"*). Steven Vivien, Gail M. Grenier, and John T. Alexander were appointed lead plaintiffs, and Keller Rohrback, L.L.P. was appointed as Lead Counsel for the *ERISA Litigation* by Order dated November 18, 2002 WL 31599531.

On December 20, plaintiffs filed the Consolidated Class Action Complaint, and later an Amended Class Action Complaint ("Complaint"). The Complaint was brought on behalf of participants in the Plan and certain predecessor plans of companies that merged with WorldCom for whose accounts the plans held shares of WorldCom stock at any time from "no later than" September 14, 1998 to the present. On June 17, 2003, the motions to dismiss filed against the Complaint were granted in part. As to Merrill Lynch Trust Company FSB ("Merrill Lynch"), the trustee for the Plan, the Complaint's allegations were found to be sufficient to plead a breach of Merrill Lynch's fiduciary duty as a trustee, but not to plead that it was a fiduciary because it acted as an investment advisor. *In re WorldCom, Inc. ERISA Litig.*, 263 F.Supp.2d 745, 761–63 (S.D.N.Y.2003).

On July 25 and September 12, plaintiffs filed a second and then a third amended consolidated class action complaint ("Amended Complaint") which added additional defendants and reasserted claims against certain previously dismissed defendants. The Amended Complaint seeks recovery for WorldCom employees who invested in WorldCom stock through the Plan and the several predecessor plans that the Plan had absorbed and alleges three claims pursuant to ERISA §§ 404(a)(1), 409, and 502(a)(2) & (3), 29 U.S.C. §§ 1104(a)(1), 1109, 1132(a)(2) & (3), for alleged breaches of fiduciary duty. The Amended Complaint asserts that Bernard J. Ebbers ("Ebbers"), Scott D. Sullivan ("Sullivan"), and Dennis W. Sickle ("Sickle") (collectively, the "Officer Defendants"); Dona Miller ("Miller"), Pamela Titus ("Titus"), Ray Helms ("Helms"), Stephanie Scott ("Scott"), and Sandra Faircloth ("Faircloth") (collectively, the "Employee Defendants"); Bert C. Roberts,

---

2. Opinions issued in the *Securities Litigation* describe the claims of the parties, the history of the litigation, and certain critical events in the history of WorldCom. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 352 F.Supp.2d 472 (S.D.N.Y.2005) (deciding summary judgment motion by auditor); *In re WorldCom, Inc. Sec. Litig.*, 346 F.Supp.2d 628 (S.D.N.Y.2004) (deciding summary judgment motion by underwriters); *In re WorldCom, Inc. Sec. Litig.*, 294

F.Supp.2d 392 (S.D.N.Y.2003) (deciding motions to dismiss the consolidated class action complaint); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y.2003) (certifying the consolidated class action); *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 431 (S.D.N.Y. 2003) (deciding a motion to dismiss claims in an individual action which had been consolidated for pre-trial purposes with the *Securities Litigation*).

John W. Sidgmore, James C. Allen, Judith Areen, Carl J. Aycock, Max E. Bobbitt, Francesco Galesi, Stiles A. Kellett, Jr., Gordon S. Macklin, Clifford L. Alexander, John A. Porter, and Lawrence C. Tucker (collectively, the "Director Defendants"); and Merrill Lynch, breached the duty of prudence in ERISA § 404(a) by continuing to offer WorldCom stock as an investment alternative within the Plan when they knew or should have known that such an investment was imprudent. The Amended Complaint also asserts that Ebbers, Sullivan, and the Director Defendants failed to monitor the fiduciary performance by ERISA plan fiduciaries appointed by those directors. Finally, the Amended Complaint claims that WorldCom, Merrill Lynch, the Officer Defendants, and the Employee Defendants failed to provide ERISA plan participants with complete and accurate information regarding World-Com stock.

Fact discovery in the *Securities Litigation* and the *ERISA Litigation* were coordinated. Document discovery was substantially completed in the Fall of 2003. Fact discovery in the *ERISA Litigation* closed on July 23, 2004. Meanwhile, on April 20, 2004, WorldCom emerged from bankruptcy as MCI, Inc. ("MCI").

An ERISA class was certified under Rule 23(b)(1)(B), Fed.R.Civ.P., on October 4, 2004. *In re WorldCom, Inc. ERISA Litigation*, No. 02 Civ. 4816(DLC), 2004 WL 2211664 (S.D.N.Y. Oct.4, 2004). The Opinion certifying the class resolved the sole challenge to certification, rejecting Merrill Lynch's attack on the definition of the class. *Id.* at *3.

On June 30, 2004, the named plaintiffs in the *ERISA Litigation* and all of the defendants except Merrill Lynch and Sullivan (the "Settling Defendants" and "Non–Settling Defendants," respectively) as well as the issuers of certain WorldCom insurance policies executed a Settlement Agreement

that, *inter alia*, established a settlement fund of $47.15 million and contained a bar order preventing the Non–Settling Defendants from bringing claims for contribution and indemnification against the Settling Defendants while providing the Non–Settling Defendants a right to a reduction in the amount of any judgment entered against them. A fairness hearing was held on October 15. The Settlement Agreement was approved in an Opinion dated October 18. *In re WorldCom, Inc. ERISA Litigation*, No. 02 Civ. 4816(DLC), 2004 WL 2338151 (S.D.N.Y. Oct.18, 2004). The trial of the ERISA claim against Merrill Lynch is scheduled to begin on May 2, 2005.

The competing summary judgment motions address, *inter alia*, the following arguments by the parties. The plaintiffs contend that Merrill Lynch violated the fiduciary duty of prudence contained in Section 404(a) of ERISA, 29 U.S.C. § 1104(a). They seek to prove that Merrill Lynch was not a directed trustee, but owed a general duty of prudence with respect to Plan investments. In the alternative, they contend that as a directed trustee, Merrill Lynch breached its more limited fiduciary duty when it failed, based on publicly available information about WorldCom's financial difficulties, and its intimate knowledge of WorldCom's administration of the Plan, to suspend the acquisition of WorldCom common stock through the Plan by at least March 13, 2002, and failed to begin a liquidation of WorldCom holdings in the Plan by April 24, 2002.

Merrill Lynch argues that it was only a directed trustee, and as such, that it owed no fiduciary duty of prudence with respect to Plan investments. It posits that a directed trustee only has statutory duties and must always follow the investment instructions of plan participants and the

administrator, except for limited circumstances not at issue here.

The following facts are undisputed or as shown by the plaintiffs unless otherwise noted. Following a description of the relevant provisions in the Plan and the Agreement, this Opinion describes the individuals at WorldCom and Merrill Lynch who held important responsibilities with respect to the Plan, and how Merrill Lynch executed its role on a day-to-day basis. This Opinion then details the public information about WorldCom that accompanied its rise and fall during the Class Period.

*The Plan*

As noted, this action is brought by and on behalf of participants in the Plan.[3] Beginning in 2000, the Plan absorbed several predecessor plans, including the MCI Plan, the IDB Communications Group, Inc. 401(k) Savings and Retirement Plan, the Western Union International, Inc. 401(k) Plan for Collectively Bargained Employees, and the SkyTel Communications, Inc. Section 401(k) Employee Retirement Plan (together, the "Predecessor Plans").

The Plan gave participants the opportunity to choose to invest their account balances in a number of different funds, including a collective trust, a mortgage-backed securities fund, a bond fund, various equity funds, and one or more funds invested in WorldCom stock.[4] Under the terms of the Plan, "[c]ontributions will be invested by the Trustee *pursuant to written direction from Participants,* each of whom has the right to choose among the investment alternatives selected by the Investment Fiduciary." Plan § 9.02 (emphasis supplied). The Plan was funded by payroll contributions from employees and matching contributions from WorldCom in the form of cash. Participants were told through the Plan's Summary Plan Descriptions that investment decisions were up to them, and encouraged them to "learn as much as [they] can about the investment choices and consult [their] professional advisors, such as [their] accountant, financial consultant or attorney." Enrollment brochures accompanying the Plan nevertheless dispensed basic investment advice, such as the suggestion that "[o]ne way to balance risk and reward is to diversify your funds, or allocate your assets."

WorldCom was the sponsor of the Plan, the Plan Administrator,[5] and the Investment Fiduciary. Plan §§ 1.02 & 1.32. Because the Plan designated the Plan Administrator and the Investment Fiduciary as "named fiduciaries,"[6] *see* Plan § 14.01, WorldCom could give directions to a directed trustee under ERISA.[7] While WorldCom had the power to appoint others to carry out the roles of Administrator and Investment Fiduciary, it never did so.

As the named fiduciary, WorldCom had the authority to delegate its fiduciary responsibilities and to rely upon information or analysis provided by persons performing ministerial functions under the Plan. Plan § 14.01. It was WorldCom's responsi-

---

3. The Plan is an "employee pension benefit plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The Plan is an "eligible individual account plan" as that term is defined in ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and a "qualified cash or deferred arrangement" as defined in I.R.C. § 401(k), 26 U.S.C. § 401(k).

4. The Plan is a "defined contribution" or "individual account" plan as defined by ERISA § 3(34), 29 U.S.C. § 1002(34).

5. As defined by ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

6. As defined by ERISA § 402(a), 29 U.S.C. § 1102(a).

7. As provided in ERISA § 403(a), 29 U.S.C. § 1103(a).

bility to choose the menu of investment options available for its employees' investments in the Plan. The Plan provides that the Investment Fiduciary's duties and powers include

without limitation, the power and discretion to:

(a) *Establish and change the investment alternatives* among which Participants may direct the investment of their accounts; and

(b) *Review* the status of the investment policy and *the selection and performance of the investment alternatives* offered under the Plan no less often than annually; and

(c) Appoint, retain or remove one or more investment managers who shall have the power to manage, acquire or dispose of assets of the Fund. An investment manager so appointed must acknowledge in writing that he is a Fiduciary with respect to the Plan....

Plan § 14.05 (emphasis supplied). The Plan obligates the Investment Fiduciary to develop an investment policy, stating: "[t]he persons designated to act on behalf of the Investment Fiduciary shall develop an investment policy for Plan assets." Plan § 14.05. It was also WorldCom's obligation to provide information to employees about the Plan. Among the Administrator's listed powers was the power to "[p]repare and distribute to Participants, in whatever manner the administrator determines to be appropriate, information explaining the Plan." Plan § 14.03(j).

Under the Plan, WorldCom had the power and discretion to "[a]ppoint, retain or remove the Trustee." Plan § 14.02(b). The Plan defines the Trustee as "the person or persons acting as trustee or trustees at any time or from time to time under the Trust Agreement." Plan § 1.62.

*The Trust Agreement*

On October 10, 1994, Merrill Lynch and LDDS Communications, Inc., which later became WorldCom, executed a Trust Agreement ("Agreement") in order to implement a 401(k) Salary Savings Plan. The Agreement provides that the "Named Investment Fiduciary" and the "Named Administrative Fiduciary" are the same as those identified in the Plan, *i.e.*, WorldCom. The Agreement provides that the Named Investment Fiduciary shall manage the investment of the trust fund except to the extent that such authority is delegated to a designated Investment Manager, or that the Plan provides for participant or beneficiary direction of the investment of assets. WorldCom never appointed an Investment Manager, although the Plan did provide for participant direction of the investment of the participant's assets, and required Merrill Lynch to follow those directions. In this context, the Agreement states:

Except as required by ERISA, the Trustee *shall invest* the Trust Fund *as directed by the Named Investment Fiduciary,* an Investment Manager *or a Plan participant* or beneficiary, as the case may be, and the Trustee *shall have no discretionary control* over, nor any other discretion regarding, the investment or reinvestment of any asset of the Trust. *The Trustee may limit the categories of assets in which the Trust Fund may be invested.*

(Emphasis supplied).

The Agreement also explicitly limits the liability of Merrill Lynch as Trustee, for instance, but excluding liability for following directions and for failing to act "in the absence of" directions. It also relieved Merrill Lynch of any obligation to review the investments. It provides:

*Directions for the investment* or reinvestment of Trust assets ... from the Employer, the Named Investment Fiduciary, an Investment Manager or a Plan participant or beneficiary, as the case

may be, *shall ... be* communicated to and *implemented by ... the Trustee .... The Trustee shall have no liability for* its or any other person's *following such directions or failing to act in the absence of such directions.* The Trustee shall have no liability for the acts or omissions of any person directing the investment or reinvestment of Trust Fund assets or making or failing to make any direction [regarding voting rights]. *Neither shall the Trustee have any duty or obligation to review any such investment or other direction,* act or omission or, except upon receipt of a proper direction, to invest or otherwise manage any asset of the Trust which is subject to the control of any such person....

(Emphasis supplied). The Agreement provides that Merrill Lynch "acknowledges its status as a 'fiduciary' of the Plan within the meaning of ERISA," and that each fiduciary of the Plan and the Trust "shall be solely responsible for its own acts or omissions." Accordingly, Merrill Lynch "shall have no duty to question any other Plan fiduciary's performance of fiduciary duties allocated to such other fiduciary pursuant to the Plan," and is not responsible "for the breach of responsibility by any other Plan fiduciary except as provided for in ERISA."

The Agreement also provides direction regarding Merrill Lynch's duties in carrying out its responsibilities as Trustee:

*The Trustee shall have no duty to inquire whether directions* by the Employer, the Named Administrative Fiduciary, the Named Investment Fiduciary or any other person *conform to the Plan,* and the Trustee shall be fully protected in relying on any such direction communicated in accordance with procedures acceptable to the Trustee from any person who the Trustee reasonably believes is a proper person to give the direction. The Trustee shall have no liability to any participant, any beneficiary or any other person for payments made, any failure to make payments, or any discontinuance of payments, on direction of the Named Administrative Fiduciary, the Named Investment Fiduciary or any designee of either of them or for any failure to make payments in the absence of directions from the Named Administrative Fiduciary or any person responsible for or purporting to be responsible for directing the investment of Trust assets. *The Trustee shall have no obligation to request proper directions* from any person. The Trustee may request instructions from the Named Administrative Fiduciary or the Named Investment Fiduciary and shall have no duty to act or liability for failure to act if such instructions are not forthcoming. The Trustee shall have no responsibility to determine whether the Trust Fund is sufficient to meet the liabilities under the Plan, and shall not be liable for payments or Plan liabilities in excess of the Trust Fund.

(Emphasis supplied).

The Agreement enumerates a number of "Nondiscretionary Investment Powers" of the Trustee that may be exercised provided the Trustee has received an appropriate direction to do so,[8] and provides for additional powers that the Trustee may exercise to the extent necessary to exercise its nondiscretionary powers or "otherwise to fulfill any of its duties and responsibilities as trustee." These additional powers included the power to register securities in the name of any nominee, to delegate its

8. Such nondiscretionary powers included, among other things, the power to invest the Plan in a wide variety of securities and trusts, to hold and manage savings accounts, to retain the powers of securities owners such as proxy votes, and to borrow money.

powers and responsibilities as needed, to execute legal documents as needed to carry out its powers as listed in the Agreement, and "generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust Fund."

Finally, the Agreement provides that it was intended as the governing document for the Trustee's responsibilities, and is controlling in the event of a conflict with the Plan:

> The rights, duties, responsibilities, obligations and liabilities of the Trustee are as set forth in this Trust Agreement, and no provision of the Plan or any other document shall be deemed to affect such rights, duties, responsibilities, obligations and liabilities. If there is a conflict between provisions of the Plan and this Trust Agreement with respect to any subject involving the Trustee, including but not limited to the responsibility, authority or powers of the Trustee, the provisions of this Trust Agreement shall be controlling.

*WorldCom as Plan Administrator and Investment Fiduciary*

As already described, WorldCom was the Plan Administrator and Investment Fiduciary. At least four WorldCom employees [9] played important roles in the administration of the Plan. In her capacity as WorldCom's Employee Benefits Director, Miller exercised day-to-day authority with respect to the Plan and gave directions to the Plan's Trustee, Merrill Lynch. As Senior Manager for Strategic Benefits, Titus assisted Miller and also worked with the Plan on a daily basis. Sickle, WorldCom's Senior Vice President for Human Resources, oversaw the Plan in addition to most other employee-related aspects of the WorldCom corporation. He sometimes attended meetings between Merrill Lynch representatives and Plan officials, and was involved in important Plan decisions, but did not work with the Plan on a day-to-day basis. Sullivan, WorldCom's Chief Financial Officer and a director, was, according to Sickle, responsible for making the final decisions regarding changes in the range of investment options offered in the Plan, although whether he in fact always made such decisions is unclear.

*Merrill Lynch*

As directed trustee for the Plan, Merrill Lynch staffed its client engagement with a financial advisor, a client relationship manager, a client service manager, and an investment strategist. Although the individuals fulfilling these roles changed over time, the client relationship manager for most of the Class Period was Thomas Eckert ("Eckert"), and the financial advisor was Michael Ryan ("Ryan"). Eckert was the primary liaison from Merrill Lynch to WorldCom on a day-to-day basis.

There is no dispute that in its role as directed trustee, Merrill Lynch assumed the burden of carrying out a number of administrative tasks, some of which included providing financial data and other information in order to assist WorldCom in its decisionmaking regarding the Plan. For example, Merrill Lynch provided WorldCom, on a quarterly basis, "client service review" packages, which contained historical information on the performance of mutual funds offered as investments in the Plan, historical information regarding the allocation of assets in the Plan, Plan service and administrative statistics, new products and services offered by Merrill

---

9. Three of the Employee Defendants, Helms, WorldCom's Senior Manager of Benefits Finance and Administration, Scott, WorldCom's Vice President for Financial Reporting, and Faircloth, the MCI 401(k) Plan's Senior Manager of 401(k) Operations and Compliance, are not central to the facts presented on summary judgment.

Lynch to all plan sponsors for whom it performed services, industry trends, and alternatives to the Plan investment lineup. From time to time, as a follow-up to these packages, Merrill Lynch employees such as Eckert, Ryan, Rene Campis, the head of client service and sales for Merrill Lynch's Group Employee Services Division, and sometimes Eckert's supervisor, Kai Walker ("Walker"), met with World-Com Plan officials such as Miller, Titus, and occasionally Sickle, for client service review meetings. These meetings reportedly took place two to three times per year, although the plaintiffs emphasize that official minutes of those meetings were generated only infrequently.

Merrill Lynch also prepared the narrative information provided to Plan participants in their enrollment materials that discussed the available investment options. Merrill Lynch helped WorldCom with its investment "mapping," which took place after each corporate acquisition, whereby investments in Predecessor Plans were converted into investments in the Plan. Additionally, at various points Merrill Lynch answered questions by WorldCom Plan officials about requests those officials had received from employees about offering other investment options.

At the direction of WorldCom, starting in September 2001, Merrill Lynch also provided a diversification service for Plan participants called "GoalManager." This enabled WorldCom to select up to five different portfolio models to offer to Plan participants based on personal risk tolerance levels ranging from "conservative" to "aggressive." WorldCom was responsible for selecting which funds offered in its Plan investment lineup would be included in which GoalManager model, and what percentage of each GoalManager model each of those mutual funds would represent. When Miller executed the document directing Merrill Lynch to provide the

GoalManager program, she signed, "Plan Fiduciary: WorldCom, Inc. by Dona Miller," underneath the following acknowledgment:

> The undersigned *Plan Fiduciary acknowledges that it exercised its own fiduciary judgement* [sic] *and sole discretion* in structuring and altering the GoalManager Portfolio Models, including choosing the number of Models to offer and the selection of (i) sub-asset classes in each model, (ii) investments representing each sub-asset class, (iii) allocation percentages and (iv) rebalancing frequency. The Plan Fiduciary also acknowledges that although Merrill Lynch may have provided information to assist the Plan Fiduciary in structuring the GoalManager Portfolio Models, *the Plan Fiduciary has not been provided nor relied upon individualized investment advice from Merrill Lynch* as a primary basis for making the above decision.

(Emphasis supplied).

Merrill Lynch also gave Plan participants access to an internet website called "Benefits Online" that provided participants with, among other things, online access to their retirement accounts for inquiries, transactional activities such as transferring investments among the available options in the Plan, and investment educational materials. For an example of the educational materials Merrill Lynch provided, on or about March 11, 2002, Merrill Lynch posted to its Benefits Online website a publication called "My Future Extra" that stated:

> Events of the past few months serve to remind every investor of the truth of the old adage, "Don't put all your eggs in one basket." To this, one might add, "... especially not your nest eggs!" If you haven't done so yet, now is the time to create a diversified portfolio, or re-

view decisions you may have made earlier on allocations of stocks, bonds and cash equivalents in your long-term savings plan.

This document explained that diversification could lower both "event risk," which it defined as "the collapse in the market price of an individual company's stock or bond," as well as "market risk," which it defined as "the risk that arises because the prices of most or all of the securities within asset categories tend, at times, to move up and down together."

There is also no dispute that individuals at Merrill Lynch were critical of WorldCom's handling of the Plan early in the client relationship, before the relevant Class Period. An internal Merrill Lynch memo dated January 23, 1995, complains of the amount of work required of it by WorldCom's predecessor, LDDS Communications, during asset conversions involved with the acquisitions of other companies, including seven acquisitions pending at that time:

The client expects Merrill Lynch to not only convert the Plan, but also research and resolve open items at previous vendors dating back as far as 1993. Merrill Lynch has probably done more in regards to legal and financial issues with this client than we should. This has been necessary because of the clients [sic] lack of expertise in the 401(k) field as well as their lack of internal controls.

There were no similar complaints during the time period relevant to this lawsuit, although Merrill Lynch continued to play an active role in providing financial data and other information to WorldCom in order to assist it in its administration of the Plan. For example, at Miller's deposition, she agreed that significant decisions with respect to Plan investments would involve the input of Merrill Lynch, and that she could not recall WorldCom ever making such a decision that was contrary to any recommendation or suggestion received from Merrill Lynch. Some of the more notable examples of Merrill Lynch's active role cited by the plaintiffs include the following. In January 2001, Eckert ghost wrote a memo for Miller to WorldCom's senior vice president and controller, David Myers ("Myers"), explaining the investment changes to the Plan that were implemented in November 2000. After a June 13, 2001 investment fund review held by Merrill Lynch for WorldCom, Eckert wrote a memo for Miller to Sickle and Sullivan describing the substance of the meeting, including a recommendation of no changes to WorldCom's investment lineup at that time. Although the plaintiffs represent Miller as having testified that the "recommendations were Merrill Lynch's recommendations," Miller agreed in her deposition that the function of Merrill Lynch was that it "provided [her] with information about what funds might be available and gave [her] information with regard to the performance history of the various funds that they presented to allow WorldCom to make a decision among those funds if they wanted one, more, or none of those funds to add to the 401(k) plan." Indeed, at the conclusion of the June 13 meeting, Miller executed a document adding two large capitalization mutual funds to the Plan's investment options. She signed the document as "Plan Fiduciary: WorldCom, Inc. by Dona Miller," underneath the following instruction and acknowledgment:

I hereby direct Merrill Lynch to make the changes indicated on this directive. I acknowledge receipt of each applicable prospectuse [sic] for the fund(s) listed in sections 1, 2 and 3 above. I further acknowledge that *Merrill Lynch has not rendered investment advice* with respect to the directions contained in this document; that *Merrill Lynch does not exercise fiduciary discretion* with respect to Plan investments, nor does Merrill

Lynch exercise any authority or control respecting the management or disposition of plan assets....

(Emphasis supplied). The plaintiffs also contend that "Merrill Lynch even provided WorldCom with sample text it could use to give Merrill Lynch directions," although the one instance of this that the plaintiffs cite involved Merrill Lynch, at the request of WorldCom, providing WorldCom with the sample text of an instruction to Merrill Lynch to remove WorldCom company stock from the lineup of investment options in the Plan in the weeks following the June 25, 2002 WorldCom announcement.

Merrill Lynch also answered questions from WorldCom officials regarding legal compliance issues. A few examples will suffice. For example, in response to a request from Miller to analyze Sullivan's fiduciary duties to the Plan, Eckert wrote a November 6, 1998 letter explaining the Trust Agreement, and providing a copy of the authorized signatures list on file with Merrill Lynch that included the names and signatures of the individuals authorized to give directions to Merrill Lynch on behalf of the WorldCom Plan. On this occasion, and a number of subsequent occasions,[10] Eckert inquired as to whether WorldCom wanted to update its authorized signatures list and designate a Named Investment Fiduciary and Named Administrative Fiduciary other than "WorldCom" as a corporate entity. As the plaintiffs point out, Eckert testified that he asked for WorldCom's updated authorized signer's list, and was told that WorldCom was still reviewing it with their ERISA counsel. For another example, in a July 9, 2001 e-mail

from Eckert to Titus, Eckert requested the addition of an agenda item to an upcoming meeting in order to discuss the idea of "formalization" through an "investment policy" or "investment committee." On August 27, 2001, Eckert wrote a letter to Miller on this topic, stating:

As we've discussed, a written investment policy statement establishes criteria and benchmarks that are important to the successful management of defined contribution plan investments. Approximately half of defined contribution plan sponsors have described their investment decision-making procedures in a written form via investment policy statements.... I suggest you review the concept and the attached documents with legal counsel. Your review with counsel may lead you to find that adoption of a formal investment policy process, and documenting that process, will help manage your fiduciary liability and ease the Department of Labor plan audit process.... As promised, I've attached a draft template for an investment policy statement that you may find useful as a starting point....

For a final example, in December 2001, after Enron declared bankruptcy, WorldCom asked Merrill Lynch for information regarding the concentration of Plan assets in WorldCom stock over the previous few years, both as a percentage of assets and total dollar volume. Sullivan had made the initial request for information, which was transmitted to Eckert through Miller. WorldCom requested an update on the same information on February 1, 2002, which Merrill Lynch provided.

---

**10.** In a January 5, 2000 letter to Miller, Eckert states the following:

As you know, Merrill Lynch Trust (MLT) serves as directed, non-discretionary trustee to your plan. Group Employee Services (GES), as the recordkeeper of your plan, is able to take instructions directly from you as long as those instructions are received in accordance with the criteria established within the Service Agreement in place between MLT and GES. This includes ensuring direction is taken from duly authorized plan sponsor representatives. Therefore, at this time, we are requesting that you update the signature specimens for those individuals authorized to direct GES.

In January 2002, Miller asked Merrill Lynch to report on legislative or regulatory initiatives to deal with flaws in 401(k) practice exposed by the Enron case, and how other companies were dealing with the company stock issue. Eckert responded to this request with a letter dated January 23, that reviewed in some detail the circumstances surrounding the Enron 401(k) plan, the allegations in the various ERISA lawsuits brought against Enron plan fiduciaries, and legislative and regulatory initiatives. Eckert stated that one of the "key components" of the Enron ERISA lawsuits included allegations of "[a]llowing company stock to remain in the plan's investment lineup while executives knew it was not a prudent investment choice." He noted that some companies had capped the percentage of company stock that could be held in their 401(k) plans, while another had discontinued the holding of company stock in its plans altogether due to a "falling stock price" and "pending asbestos litigation." Eckert also stated that 401(k) industry experts anticipated that in situations where company stock prices dropped precipitously, plan participants would likely file lawsuits alleging

that the management representatives who act as plan fiduciaries responsible for prudent investment lineup selection are the same individuals who are closest to the true financial "picture" of the company, and should not allow continued company stock investing in the plan by unsuspecting rank/file participants if the stock is ripe for a fall.

Eckert pointed out, however, that

many plan sponsors will wait to see if the current legislative proposals become reality, and then proceed with changes, such as the proposed 20% company stock allocation limit [in the Boxer/Corzine proposal].... The advantage to waiting for such guidance is that the employer can point somewhere else for

the direction. Without that direction, an employer-mandated reduction in the participants' company stock allocations can have a negative effect on the population of investment-savvy participants who are interested in investing heavily in company stock. Such participants will not take kindly to rules that they perceive as penalizing them due to the employer's goal of protecting the "less savvy" participants from themselves.

Eckert made a number of comparisons between the Plan and the Enron 401(k) plan, noting that while the Plan "had 31% of its assets in company stock as of today's close[,] ... the Enron plan had 62% of its assets in company stock prior to its price collapse." Eckert closed the letter, writing: "Dona, as we've discussed, we would like to meet in the near future for a 401(k) investment review for the WorldCom plan. At your direction, we'll include a company stock agenda item. Please let me know how you would like to proceed...." Miller sent an e-mail response to Eckert on January 24 stating: "This is perfect and exactly the information that is needed for discussion purposes." That same day, Sharon Dixon ("Dixon"), the Plan's ERISA counsel, sent an e-mail to Miller, Eckert, Ryan, and Titus, stating: "The Enron debacle highlights the necessity for reviewing stock in a plan, although the WorldCom Plan stands out as one that should not suffer from Enron-type woes." The e-mail agreed that legislators might "impose still additional and extremely cumbersome rules, which the Enrons of the world likely will continue to violate and under which the WorldComs of the world will labor." Dixon closed by stating, "Dona, I do wonder if WorldCom's investment policy couldn't use some brushing up. Please call me about that when you have a moment."

In February 2002, Miller asked Eckert to identify whether the WorldCom Plan had the same features that had been the subject of criticism in the press and in

Congress with respect to the Enron 401(k) plan. Eckert wrote a letter dated February 22, to Miller highlighting five aspects of the WorldCom Plan that distinguished it from that of Enron, including no restrictions on the timing or frequency of participant changes to their investment choices, no restrictions on the timing of distributions, dollar-for-dollar cash matching of participant contributions by WorldCom up to 5% of salary, no requirement that WorldCom employees invest in company stock (including the fact that none of the GoalManager portfolio models contained any company stock), and the literature associated with the Plan did not urge participants to purchase company stock.

WorldCom employees such as Sickle, Miller, and Titus all describe Merrill Lynch's services as directed trustee to have been administrative. Merrill Lynch employees such as Eckert, as well as his supervisor, Walker, explained that the only limits that Merrill Lynch could, or did, place on investments directed by World-Com was whether or not the option was "tradeable," or, in the words of Eckert, "mechanically possible." If an investment were tradeable by Merrill Lynch, Merrill Lynch did not have the authority, according to Eckert's understanding, to decline to follow the instructions it was given.

Following the June 25, 2002 announcement, and after Nasdaq suspended the trading of WorldCom stock and MCI tracking stock on June 26, Eckert wrote a letter to Titus dated June 27 outlining "our agreed-upon processes for the handling of your plan's recordkeeping services," and stating that "[y]ou have discussed the possibility of directing us to change such investment directions to Merrill Lynch Retirement Preservation Trust for this payroll, and possibly beyond. We need this direction by 2 p.m. on June 27th to accomplish this for the timely posting of the entire payroll file." The letter goes on

to state: "We need WorldCom's written confirmation of all of the above items, as well as written direction for how to proceed with the payroll. I've copied Sharon Dixon on this correspondence, so she can review, and provide her insights to you." In an e-mail that same day from Dixon, the Plan's ERISA counsel, to Miller, Dixon wrote:

> The Company as investment fiduciary has chosen all available investment funds, including the Company stock.... Right now, with the trading freeze on Company stock, Merrill Lynch cannot effect any trades or purchase any shares of WorldCom.... Therefore, it's *crucial* that the Company as investment fiduciary provide direction to Merrill as to how to invest the contributions for those participants whose elections on file are to purchase Company stock. *THEY NEED THIS DIRECTION TODAY.* The Company also needs to determine what to do if/when the trading freeze is lifted, i.e., whether Company stock will remain as an investment choice for future contributions. In view of current events, the Company as investment fiduciary should consider this decision very carefully. The Company also should consider whether it's appropriate to install an 'outside' fiduciary to help with [this] decision about the Company stock.

(Emphasis in original). Dixon reiterated these concerns the following day in an e-mail to Sickle, Miller, Titus, and Anthony V. Alfano, inside counsel for WorldCom. There is no evidence that Merrill Lynch had any non-public information that would have led it to conclude before June 25, 2002, that WorldCom officials had been concealing the true state of WorldCom's financial condition.

### The Rise and Fall of WorldCom

There is no dispute that Merrill Lynch had, or could have had, the following public information at its disposal as the Class

Period proceeded. WorldCom and MCI completed their corporate merger on September 14, 1998, when WorldCom's stock price closed at $47.75 per share. On June 21, 1999, WorldCom stock closed at its all-time high of $96.75 per share. When adjusted for a three-for-two stock split on December 20, 1999, the closing price of WorldCom stock as of June 21, 1999 was $62.

WorldCom's publicly reported financial results for the third quarter 1998 announced revenues of $3.8 billion, representing a 97% increase over revenues for the third quarter 1997, and a 44% increase over revenues for the second quarter 1998. By the end of 1999, WorldCom's financial statements filed with the SEC reflected annual revenues of $35.91 billion and an operating income of $7.89 billion, which reflected a significant improvement in profitability over the previous year. Relevant industry comparisons include AT & T Corp., which reported revenues of $54.973 billion and an operating income of $11.458 billion, and Sprint Corp., which reported revenues of $20.265 billion and an operating income of negative $307 million. In 2000, WorldCom reported profits and revenues of $8.15 billion and $39.09 billion, respectively, and surpassed the profits reported by both AT & T and Sprint. From 1998 to 2000, many market analysts gave extremely favorable reports on WorldCom stock. For example, a March 19, 1999 Standard & Poor's report stated that out of 34 analysts offering an opinion on WorldCom stock, 32 rated it as a "Buy" or a "Buy/Hold" and none rated it as a "Sell."

By March 2001, the economy had entered a downturn that was being labeled as a "recession" by many economists. This recession became more severe following the events of September 11, 2001. The recession was marked by significant declines in stock market indices, including the Nasdaq composite index that included WorldCom stock. Between February 2000 and July 2002, the Nasdaq lost almost 53% of its value, and the value of securities in the Dow Jones Telecommunications Index dropped by almost 75%. From February 1, 2000 to June 25, 2002, AT & T stock moved from $52.50 per share to $9.99 per share, and Sprint stock moved from $63.375 per share to $11.29 per share. The December 23, 2000 stock report by Standard & Poor's stated that it continued to view WorldCom as "one of the strongest companies in the telecommunications sector," and had downgraded it from "buy" to "accumulate" only to "reflect[ ] current investor lack of favor for the telecom industry." In the year 2001, WorldCom reported operating income of $3.51 billion on revenues of $35.18 billion, while AT & T reported operating income of $3.75 billion on revenues of $52.55 billion, and Sprint reported an operating deficit of $662 million on revenues of $26.07 billion.

The plaintiffs point to a wide array of news articles starting in January 2002 that report the continuing decline in WorldCom stock prices and concerns over WorldCom's accounting and management. Despite such articles, analyst reports on WorldCom during this time were mixed. Although some analysts downgraded their ratings of WorldCom stock, others sought to allay concerns. A February 8 J.P. Morgan[11] analyst's report stated:

> Concerns relating to the aggressive accounting policies and liquidity concerns have been rampant over the course of

---

11. It is worth noting that J.P. Morgan was one of ten financial firms that were fined as part of a settlement with, among other entities, the Securities and Exchange Commission, in April 2003. This settlement was in response to allegations that the firms allowed investment banking groups to exert inappropriate influence over research analysts, thereby creating conflicts of interest that may have colored the reports by those analysts.

the past few weeks driving the stock to new lows. These concerns for the most part proved unfounded and to the extent that they are valid the Company has provided investors with adequate information to evaluate the risk involved. Thus we conclude that the stock is currently reflecting all accounting issues brought to light.

By February 15, news articles began to report on an internal investigation being conducted by WorldCom into an order-booking scheme that may have boosted sales commissions in three of its branch offices. Some analyst reports continued to give reassuring opinions about WorldCom, such as a March 5 Sanford Bernstein analyst report that stated that "WorldCom is better positioned than any other carrier" and that "[c]urrent valuations are partially a result of the market's overreaction to concerns about the company's balance sheets, a concern not relevant to World-Com, Inc., which has a lower net debt/capital ratio and better interest coverage than almost any company in our group even after accounting for the likely write-down of $20B in goodwill." On March 7, an A.G. Edwards analysts' report stated that WorldCom was "one of the strongest, best-positioned global backbone providers."

On March 11, WorldCom announced that it had received a confidential request for the production of documents and information from the SEC with respect to certain aspects of its accounting. Some news reports covering the story indicated surprise at the breadth and scope of the SEC's document requests. On March 13, Merrill Lynch & Co.[12] telecommunications analyst Adam Quinton ("Quinton") downgraded WorldCom stock from a "buy" to a "hold" on a short-term investment. In this report, Quinton wrote:

While the [SEC] investigation creates uncertainty the enterprise telecom tracker WCOM currently trades on about 10.4x our 2002E EPS and 5.7x EBITDA, which is attractive relative to the group. Thus given the company's strong position in an industry that should see a revival of growth with the economy (albeit on a lagged basis and restrained perhaps and as excess capacity is washed out of the industry), we maintain our long-term Buy rating.

By the beginning of April, news reports focused on WorldCom's announcement of job cuts, as well as WorldCom stock's dip below the $5 per share value mark. On April 19, WorldCom revised downwards its earnings estimates and forecasts for the year 2002, although it reported that it still expected to earn an overall profit during the year, and anticipated revenues of $21–21.5 billion. The plaintiffs claim that in the five days following this announcement, at least eleven analysts downgraded their ratings of WorldCom stock. Among these reports, Quinton downgraded his rating of WorldCom stock to "reduce/sell" on April 22, 2002.

On April 25, WorldCom released its financial results for the first quarter 2002, which were the last financial results publicly released before the June 25 announcement of WorldCom's accounting improprieties. In this report, WorldCom announced revenues of $5.08 billion, and EBITDA (earnings before interest, taxes, depreciation and amortization) of $1.76 billion. These results continued to report positive net income. That day, Bear Stearns issued an analyst's report stating that "we believe management demonstrated the company's liquidity position is not the catastrophe the market has been suggesting.

12. Quinton's report came from the Global Securities Research & Economics Group of Merrill Lynch & Co., the holding company for a variety of Merrill Lynch subsidiaries. Merrill Lynch Trust Company FSB is a separate subsidiary within Merrill Lynch & Co.

Unless fundamentals deteriorate further, we believe WorldCom has the capacity to service its obligations." On April 26, Quinton issued a further report commenting on WorldCom's first quarter results and reiterating the stock rating of "reduce/sell."

On April 29, Ebbers resigned, sparking a new round of press reports speculating about the future of the company. On May 22, a Sanford Bernstein analyst report stated that although it recognized "a number of serious potential risks to the company's future operating performance" such as "[c]ustomer/share losses resulting from buyer concerns about WorldCom's highly publicized financial health" and "[f]inancial restatements driven by the SEC investigation," it nevertheless reiterated:

> We maintain our Outperform rating on WCOM for four reasons: (1) the large enterprise business has significant and often underestimated barriers to entry for the RBOCs, (2) WorldCom has significant front-end cyclical exposure and will rebound before other telecos in an economic recovery, (3) WorldCom's free cashflow generating capabilities—assuming (1) and (2) are correct—imply the company should be able to meet its financial obligations for at least the next several years, and (4) On valuation, WCOM offers an option on a 300%+ return on investment for current holders.

On that same day, Walker sent an e-mail to Eckert stating: "I told Peggy that given [WorldCom's] financial situation that there is a 30% chance they could be sold or go bankrupt."

At the beginning of June, press reports concentrated on WorldCom's announcement of plans for another, more substantial, round of job cuts. On June 25, WorldCom announced that it would restate its 2001 and first quarter 2002 financial statements, because it had failed to comply with "Generally Accepted Accounting Principles" (GAAP). It announced that its reported EBITDA for 2001 would be $6.34 billion, and for the first quarter 2002 would be $1.37 billion, representing a total reduction in EBITDA of almost $3.8 billion. That same day, WorldCom announced the termination of Sullivan's employment and the resignation of Myers. As a result of WorldCom's restatement, Nasdaq suspended the trading of WorldCom's stock and its MCI tracking stock. WorldCom filed for bankruptcy protection on July 21 in what some have reported as the largest bankruptcy in the history of the United States.

As of June 25, a large number of sophisticated institutional investors held substantial positions in WorldCom stock. For example, the California Public Employees Retirement System (CalPERS) held nearly 11 million shares of WorldCom stock at that time. The Ohio Public Employees Retirement System held almost 10 million shares of WorldCom stock at that time. Other public pension plans such as the California State Teachers Retirement System and the New York State Common Retirement Fund each held over 8 million shares of WorldCom stock at the end of June 2002.[13]

---

**13.** In their Response to Merrill Lynch's Statement of Uncontested Material Facts, the plaintiffs contend in paragraph 154 that when viewed as a percentage of pension funds' total net worth, the WorldCom investments represented a small percentage of their assets, while the composition of the Plan held "at least 30% and as much as 55% of its value in WorldCom stock." The documents plaintiffs cite to support this contention are plaintiffs' tab 215, and in paragraph 155, plaintiffs' tab 216. Document 215, a spreadsheet containing the WorldCom stock holdings of various pension funds from 1997 to September 2002 does, indeed, demonstrate that the holdings of WorldCom stock in various pension plans were typically below 5% of total assets, but it

Moreover, between January and June 2002, several managers of Merrill Lynch mutual funds increased the holdings of WorldCom stock within their respective mutual funds. For example, in January 2002, the Merrill Lynch Focus Value Fund, Inc. held no WorldCom stock, but in April 2002, it held approximately 2.5 million shares of WorldCom stock. The Fund continued to increase its holdings to 3,687,-200 shares in May 2002, and to 4,836,000 shares in June 2002. The Fund continued to hold these shares as of the time World-Com announced it was filing for bankruptcy. Likewise, the Merrill Lynch Basic Value V.1 Fund started January 2002 with no shares of WorldCom stock, but in April 2002, the co-managers of that Fund purchased over 1 million shares. They increased the holdings of WorldCom stock to 3,153,200 shares by the end of May, and increased their holdings again in June, holding a total of 3,542,200 shares as of WorldCom's filing for bankruptcy.

The Focus Value and Basic Value funds are considered by their managers to be "value" funds, which means that they invest in stocks that they deem to be undervalued by the market. The managers have testified that they perform their own independent analysis of publicly available information concerning the companies in which they are considering investing. They have testified that the most important factor they consider in their decision of whether to purchase shares of a company's stock is the financial statements produced by the company.

The Merrill Lynch Global Allocation Fund, which held 950,000 shares of World-Com stock in January 2002, held 8.8 million shares as of the time WorldCom was filing for bankruptcy. The Merrill Lynch Variable Series Global Allocation V.1 Fund increased its holdings of WorldCom stock from January to June 2002 from 85,000 shares to 565,000 shares. The Global Allocation funds are also considered by their managers to be "value" funds, and the managers have testified that one of the main factors those managers use in determining whether to invest in stock is the company's EBITDA.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.*, 302 F.3d 83, 91 (2d Cir.2002).

In addressing Merrill Lynch's summary judgment motion, there are essentially two

does not include any information about the Plan. Document 216 contains the Plan's IRS Form 5500 for the years 1999 and 2000, and indicates that at the end of 1999, the Plan held 54.6% of its total assets in WorldCom stock, and that by the end of 2000, this figure had dropped to 32%. There is no data for 2001 or 2002. This Court notes that Eckert's January 23, 2002 letter to Miller stated that as of *that day*, the Plan had 31% of its assets in company stock.

issues to resolve.[14] The first issue is whether Merrill Lynch was a directed trustee. Having answered that question in the affirmative, the second is the scope of Merrill Lynch's duties under ERISA as a directed trustee.

### 1. Merrill Lynch's Status as a Directed Trustee

Merrill Lynch contends that it was a directed trustee pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a). The plaintiffs contend that Merrill Lynch was not a fiduciary because of its role as a directed trustee, but instead was simply an ERISA Plan fiduciary, apparently pursuant to ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).[15] The resolution of this dispute will affect the scope of Merrill Lynch's responsibilities under ERISA.

ERISA is a "comprehensive and reticulated statute" that governs employee benefit plans.[16] *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (citation omitted). ERISA is designed to protect employee pension and benefit plans by, among other things, "setting forth certain general fiduciary duties applicable to the management" of those plans. *Varity Corp. v. Howe*, 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

ERISA allows a plan to designate what courts have labeled a "directed trustee." Section 403(a), 29 U.S.C. § 1103(a), the directed trustee provision ("Section 403(a)"), states in pertinent part,

> [A]ll assets of an employee benefit plan shall be held in trust by one or more trustees.... [T]he trustee ... shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that—
>
> (1) the plan expressly provides that the trustee ... [is] subject to the direction of a named fiduciary who is not a trustee, in which case the *trustees shall be subject to proper directions* of such fiduciary which are made in accordance with the terms of the plan and *which are not contrary to this chapter* ....

29 U.S.C. § 1103(a) (emphasis supplied).

■ The Plan documents establish that Merrill Lynch was a directed trustee. WorldCom, as the Investment Fiduciary of the Plan, had the power and discretion to establish and change the options among

---

**14.** The parties have briefed a number of additional issues that it is unnecessary to reach. Merrill Lynch advances two affirmative defenses, arguing: (1) that Section 404(c) of ERISA, 29 U.S.C. § 1104(c), exempts it from liability because it followed the directions of participants; and (2) that the liability releases that some class members have signed exempt it from liability. The plaintiffs move for partial summary judgment, asserting that the Section 404(c) affirmative defense is unavailable to Merrill Lynch. Because Merrill Lynch prevails on its argument that the evidence produced by the plaintiffs is not sufficient as a matter of law to support the conclusion that it breached its fiduciary duties as directed trustee, it is unnecessary for this Opinion to address those affirmative defenses.

**15.** The plaintiffs originally sought to hold Merrill Lynch liable for its role in administering the Plan, and as the Plan's investment advisor. *See In re WorldCom, Inc. ERISA Litig.*, 263 F.Supp.2d at 761. The Opinion addressing Merrill Lynch's motion to dismiss held that the plaintiffs could not proceed on the theory that Merrill Lynch was an investment advisor, *id.* at 762–63, but found that Merrill Lynch, as a directed trustee, was an ERISA fiduciary, and that the Complaint had stated a claim against Merrill Lynch for the breach of its fiduciary duties. *Id.* at 762, 772. In resisting summary judgment, the plaintiffs seek to revisit the issue of whether Merrill Lynch has fiduciary duties beyond those accompanying its status as a directed trustee.

**16.** This Opinion draws, in part, upon the law set forth in the Opinion addressing the parties' motions to dismiss. *See In re WorldCom, Inc. ERISA Litig.*, 263 F.Supp.2d 745.

which participants could choose to invest their 401(k) contributions. The Plan allows the Plan Administrator, again WorldCom, to appoint a Trustee who will invest contributions pursuant to participants' directions. WorldCom appointed Merrill Lynch as the Plan Trustee. Under the Agreement between WorldCom and Merrill Lynch, Merrill Lynch was required to invest funds as directed. Merrill Lynch was not obliged to review the soundness of any investment or direction it received, and it was explicitly relieved of liability for following directions. These undisputed facts are sufficient to establish that Merrill Lynch was a directed trustee under the terms of Section 403(a).

The plaintiffs argue that Merrill Lynch is not a directed trustee because Section 403(a) requires that trustees "shall be subject to proper directions" from a named fiduciary. The plaintiffs point out (1) that under the Plan, it was participants, and not WorldCom or another fiduciary, who gave Merrill Lynch directions regarding where to invest the 401(k) contributions, and (2) that two provisions of the Agreement can be read to give Merrill Lynch more discretion than Section 403(a) permits.[17]

Even though it was the participants who gave Merrill Lynch specific instructions regarding the allocation of funds among 401(k) accounts, the Plan and Agreement required Merrill Lynch to follow WorldCom's instructions in every other material way. Among other things, it was WorldCom that chose which investment alternatives were available to Plan participants, and that gave Merrill Lynch the orders it needed to set up the accounts through which participants could invest in the alternatives selected by WorldCom. In hiring Merrill Lynch and executing the Agreement, WorldCom required Merrill Lynch to follow participants' directions when they made their choices among the investment options. Merrill Lynch was subject to WorldCom's directions in every aspect of the relationship that is relevant to an analysis under Section 403(a).

Nor have the plaintiffs shown that the Agreement gave Merrill Lynch discretion in a way that is inconsistent with its status as a directed trustee. The plaintiffs emphasize two sentences in the Agreement that they argue gave Merrill Lynch more discretion than was appropriate for a directed trustee. First, they contend that the statement that "[t]he Trustee may limit the categories of assets in which the Trust Fund may be invested" vests Merrill Lynch with precisely the type of investment discretion that could not be granted to a directed trustee. This sentence appears at the end of a paragraph that provides expressly that Merrill Lynch "shall have no discretionary control over, nor any other discretion regarding the investment" of any asset. The Agreement explicitly obliges Merrill Lynch to follow WorldCom's directions. It is a well-established principle of contract construction that "all provisions of a contract be read together as a harmonious whole, if possible." *Perreca v. Gluck*, 295 F.3d 215, 224 (2d Cir. 2002) (citation omitted) (interpreting ERISA plan). *See also Empire Props. Corp. v. Mfrs. Trust Co.*, 288 N.Y. 242, 43 N.E.2d 25, 28 (1942). The obvious meaning of the sentence upon which plaintiffs rely, and the only one that is consistent with both the uncontradicted testimony of witnesses as well as the rest of the Agreement, is that Merrill Lynch was allowed to limit WorldCom's choice of the categories

---

17. It is worth noting that the plaintiffs do not explain specifically in their summary judgment submissions from what statutory provision Merrill Lynch would derive its fiduciary status if it were deemed not to be a directed trustee, although this Opinion assumes that they would turn to ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

of assets into which the Plan could be invested to the types of assets that Merrill Lynch was physically equipped to trade.

Second, the plaintiffs point to the fact that the Agreement grants powers to Merrill Lynch that include the power "generally to do all other acts which the Trustee deems necessary or appropriate for the protection of the Trust Fund." This provision complements the itemization of Merrill Lynch's duties which precede it. That itemization was the grant of powers that it was necessary for Merrill Lynch to possess in order to exercise its nondiscretionary investment powers or other duties as a directed trustee. To the extent that the preceding grant of specified powers to Merrill Lynch omitted any power that was necessary for Merrill Lynch to act effectively as a trustee, this sentence to which the plaintiffs point bridged the gap. It enabled Merrill Lynch to act to protect the Plan where such actions were required of directed trustees. Moreover, WorldCom officials repeatedly signed investment directions to Merrill Lynch that acknowledged that Merrill Lynch did not exercise any fiduciary discretion with respect to Plan investments. In sum, none of the evidence presented by the plaintiffs raises a question of fact as to whether Merrill Lynch is properly considered a directed trustee pursuant to Section 403(a) of ERISA, 29 U.S.C. § 1103(a).

### 2. Fiduciary Duty of Directed Trustee To Act

The parties also dispute the standard that applies under ERISA to Merrill Lynch's obligations as a directed trustee. Merrill Lynch argues that a directed trustee is not a fiduciary with respect to investments in the Plan, and therefore does not owe a fiduciary duty of prudence with respect to those investments. It contends that Section 403(a) of ERISA creates statutory, not fiduciary duties for directed trustees. In the alternative, Merrill Lynch argues that if a directed trustee has a fiduciary duty with respect to the Plan's investments, the duty is only to inquire into the prudence of an investment fiduciary's direction to invest in a publicly traded stock if the trustee knows of non-public information that could significantly affect the value of the stock or public information of the impending dissolution of the company, or if it has reasonable grounds to question the trustworthiness of the fiduciary giving it directions. Under that standard, Merrill Lynch argues, it did not breach any fiduciary duty.

The plaintiffs dispute Merrill Lynch's contention that a directed trustee is not a fiduciary with respect to Plan investments, and they further dispute Merrill Lynch's description of the scope of a directed trustee's fiduciary duty. The plaintiffs argue that a directed trustee breaches its fiduciary duty if it fails to act when it knows or ought to know because of the existence of red flags (1) that the directions it receives from a named fiduciary are imprudent, disloyal, or otherwise violate ERISA, or (2) that a co-fiduciary is breaching its own fiduciary duty to a plan.

According to the plaintiffs, Merrill Lynch should have suspended the acquisitions of WorldCom common stock by March 13, 2002, insisted that WorldCom immediately commence a review of the prudence of the continued holding of such securities, and begun a liquidation of WorldCom securities by April 24.[18] On March 13, on the heels of the reports of the SEC request to WorldCom for docu-

18. The plaintiffs also contend, through their fiduciary expert, that Merrill Lynch should have suspended the acquisitions of MCI tracking stock by November 1, 2001, insisted upon an immediate review of the prudence of the continued holding of the stock, and begun a liquidation of those holdings by December 15. The expert report does not indicate a basis for

ments, Merrill Lynch & Co. analyst Quinton downgraded WorldCom stock from a "buy" to a "hold" when it was a short-term investment. He maintained a "buy" rating for a long-term investment in WorldCom securities. The plaintiffs apparently believe that on April 24, Quinton downgraded WorldCom stock to "Reduce/Sell." [19] The plaintiffs contend that as of those dates, Merrill Lynch was on notice that WorldCom, a named fiduciary, was the subject of an investigation of corporate wrongdoing; that there were "serious" questions about WorldCom's future prospects and accounting practices; that WorldCom, a "mammoth" corporation, was "unraveling" and in "serious" trouble; and that WorldCom was not reviewing the prudence of the Plan's investment in WorldCom securities. According to the plaintiffs each of these facts constituted red flags that required Merrill Lynch to act.

■ In ruling on Merrill Lynch's motion to dismiss, this Court held that a directed trustee is an ERISA fiduciary. *In re WorldCom, Inc. ERISA Litig.*, 263 F.Supp.2d at 761–62. While a directed trustee is deprived of discretion to manage and control plan assets, it has responsibility over ERISA assets and is obliged to follow only those directions of a named fiduciary that are "proper" and not "contrary to" ERISA. *Id.* at 761 (citing 29 U.S.C. § 1103(a)). Since that decision, an interpretive bulletin issued by the Department of Labor has advised that a "trustee, therefore, will, by definition, always be a 'fiduciary' under ERISA as a result of its authority or control over plan assets." U.S. Department of Labor, Field Assistance Bulletin 2004–03 (Dec. 17, 2004). In addition, other courts considering the issue have also held that directed trustees are ERISA fiduciaries. *See Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1102 (9th Cir.2004) (discussion of trustee's potential liability under ERISA assumes a directed trustee is a fiduciary); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F.Supp.2d 132, 150 (D.Mass.2004); *In re Sprint Corp. ERISA Litig.*, No. 03–2202–JWL, 2004 WL 1179371, at *23–25 (D.Kan. May 27, 2004); *Beam v. HSBC Bank USA*, No. 02–CV–0682E(F), 2003 WL 22087589, at *2 (W.D.N.Y. Aug.19, 2003); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F.Supp.2d 511, 581–602 (S.D.Tex.2003) (includes comprehensive discussion of the issue). Nothing presented by Merrill Lynch on this motion suggests that the earlier ruling in this litigation, which is in any event the law of this case, should be revisited.

■ A directed trustee breaches its fiduciary duty when it breaches the "prudent man standard of care" that applies to all ERISA fiduciaries pursuant to Section 404(a), 29 U.S.C. § 1104(a).[20] Since a per-

---

selecting these dates. The plaintiffs' opposition brief refers to an October 26, 2001 analyst report by Quinton that downgraded the rating for MCI tracking stock to "reduce," but does not otherwise describe events pertaining to this stock.

19. The citation the plaintiffs provide for this date is incorrect, and the April 24, 2002 newspaper article to which plaintiffs refer does not contain any information pertaining to Quinton. Merrill Lynch, however, reproduces two documents that appear to represent the initial downgrade by Quinton on April 22, followed by a second report reiterating the same rating on April 26.

20. The prudent man standard applicable to ERISA fiduciaries is as follows:

> (1) ... a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants and beneficiaries* and—
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries ...
> ....
> (B) with the *care, skill, prudence, and diligence* under the circumstances then pre-

son is a fiduciary to a plan only "to the extent" the person functions as a fiduciary, 29 U.S.C. § 1002(21)(A), the fiduciary obligations of directed trustees are circumscribed by the parameters of their duties pursuant to Section 403(a). *In re World-Com, Inc. ERISA Litig.*, 263 F.Supp.2d at 762. A directed trustee must discharge its own duties in conformity with the prudent man standard of care, and avoid prohibited transactions. It may not comply with a direction from a named fiduciary that it knows or ought to know is violating that fiduciary's obligations to plan beneficiaries. And, it must attempt to remedy known breaches of duty by other plan fiduciaries. *Id.* (citation omitted). In this latter connection, every ERISA fiduciary, regardless of the parameters of its duties, is subject to the co-fiduciary liability provision of Section 405(a), 29 U.S.C. § 1105(a) ("Section 405(a)").[21] Section 405(a) provides:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) *if he participates knowingly in,* or knowingly undertakes to conceal, *an act or omission of such other fiduciary, knowing such act or omission is a breach;*
>
> (2) *if, by his failure to comply with section 1104(a)(1) of this title* [the pru-

dent man standard of care] *in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;* or

> (3) *if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.*

29 U.S.C. § 1105(a) (emphasis supplied). Under this standard, a directed trustee may not follow the directions of a named fiduciary in circumstances where it has "knowledge" that such directions represent a breach of the named fiduciary's duties. 29 U.S.C. § 1105(a)(3). As the Eighth Circuit has observed, "an ERISA trustee who deals with plan assets in accordance with proper directions of another fiduciary is not relieved of its fiduciary duties ... to attempt to remedy known breaches of duty by other fiduciaries." *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911 (8th Cir.1994).

The Department of Labor recently addressed those circumstances in which a directed trustee has a duty to make an inquiry of a named fiduciary before investing plan assets as directed. *See* U.S. Department of Labor, *In the Context of Publicly Traded Securities, What Are the Fiduciary Responsibilities of a Directed Trustee?*, Field Assistance Bulletin 2004–03 (Dec. 17, 2004) ("Bulletin").[22] The Bulletin was intended to provide "general guidance to EBSA [Employee Benefits Security Administration] regional offices

---

vailing *that a prudent man* acting in a like capacity and familiar with such matters *would use* in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are

consistent with the provisions of this subchapter and subchapter III of this chapter.
. . . .

29 U.S.C. § 1104(a).

**21.** The plaintiffs have not sought to hold Merrill Lynch liable for a breach of Section 405(a).

**22.** The Bulletin may be obtained at http://www.dol.gov/ebsa/regs/fab_2004-3.html.

regarding the Department's views on the responsibilities of directed trustees under ERISA, particularly with respect to directions involving employer securities." *Id.*

■ It is well-settled that when an agency sets forth an opinion regarding a statute within its enforcement purview in the form of an "interpretive bulletin," such an opinion, while not controlling, is "entitled to respect" to the extent that it has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 83 (2d Cir.2004). Although bulletins are not created pursuant to formal notice-and-comment rule-making procedures, they are made pursuant to "official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." *Skidmore*, 323 U.S. at 139, 65 S.Ct. 161. Consequently, courts may grant "considerable and in some cases decisive weight" to a bulletin depending on, among other things, the "thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id.* at 140, 65 S.Ct. 161.

■ The Bulletin is consistent with prior statements of the law governing the fiduciary duties of directed trustees, as it draws from prior authorities such as *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1361–62, 1370 (11th Cir.1997), *FirsTier Bank*, 16 F.3d at 910, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F.Supp.2d at 601, and *In re WorldCom, Inc.*, 263 F.Supp.2d at 762. Although the Bulletin breaks new ground by giving concrete guidance to directed trustees about their duty to inquire into the prudence of investment decisions, the opinions expressed in the Bulletin are well-reasoned and flow from a careful analysis of complex issues. The Bulletin anticipates many of the central issues facing directed trustees in deciding how to fulfill their fiduciary duties, and provides specific and helpful example-based guidance that effectively balances important policy concerns embodied in the ERISA statute. The Bulletin, therefore, reflects persuasive authority to which this Court should give at least substantial weight in articulating the standard that should be applied to a directed trustee's responsibilities when receiving a direction to invest plan assets in particular securities, and especially directions to invest in the securities of the employer.

The Bulletin acknowledges that Section 403(a) of ERISA does not "eliminate the fiduciary status or duties that normally adhere to a trustee with responsibility over ERISA assets," but that by virtue of the limited responsibilities of directed trustees, their fiduciary duties are "significantly narrower than the duties generally ascribed to a discretionary trustee under common trust principles." The Bulletin endorses the proposition that a directed trustee's duty to act arises from its *knowledge*, stating that a directed trustee may not follow a direction that the trustee "knows or should know" is contrary to ERISA or the terms of an ERISA plan.

The Bulletin opines that the scope of a directed trustee's duty to determine the prudence of a particular investment is "significantly limited." The Bulletin posits two situations in which the duty of prudence may be breached: where the directed trustee has a duty to act based on possession of material non-public information, and based on possession of publicly available information.

In circumstances where a directed trustee possesses material non-public informa-

tion that is necessary to evaluate the prudence of an investment decision,

> the directed trustee, prior to following a direction that would be affected by such information, *has a duty to inquire about the named fiduciary's knowledge and consideration of the information* with respect to the direction. For example, if a directed trustee has non-public information indicating that a company's public financial statements contain material misrepresentations that significantly inflate the company's earnings, the trustee could not simply follow a direction to purchase that company's stock at an artificially inflated price.

*Id.* (emphasis supplied). Therefore, if a directed trustee

> performs an internal analysis in which it *concludes that the company's current financial statements are materially inaccurate, the directed trustee would have an obligation to disclose this analysis to the named fiduciary* before making a determination whether to follow a direction to purchase the company's security. The directed trustee would not have an obligation to disclose reports and analyses that are available to the public.

*Id.* (emphasis supplied).

According to the Bulletin, when a directed trustee does not possess material non-public information, it will *"rarely* have an obligation under ERISA to question the prudence of a direction to purchase publicly traded securities at the market price solely on the basis of publicly available information." *Id.* (emphasis supplied). The Bulletin bases its conclusion on four well-settled principles. First, financial markets are assumed to be efficient, such that the prices of securities reflect all publicly available information and known

risks.[23] Second, in the case of employer securities, the securities laws impose substantial obligations and deterrence costs on the company, its officers, and its accountants to state their financial records accurately. Third, Section 404 of ERISA requires the instructing fiduciary to adhere to a stringent standard of care. Fourth, because stock prices "fluctuate as a matter of course, even a steep drop in a stock's price would not, in and of itself, indicate that a named fiduciary's direction to purchase or hold such stock is imprudent and, therefore, not a proper direction." *Id.*

The Bulletin describes the "extraordinary" circumstances in which a directed trustee would have a duty to act on public information as the possession of information that raises a "serious" question regarding a company's "viability as a going concern." The Bulletin notes that in

> limited, extraordinary circumstances, where there are *clear and compelling public indicators,* as evidenced by an 8–K filing with the Securities and Exchange Commission (SEC), a bankruptcy filing or similar public indicator, *that call into serious question a company's viability as a going concern,* the directed trustee may have a duty not to follow the named fiduciary's instruction without further inquiry.

*Id.* (emphasis supplied). The Bulletin emphasizes the Department of Labor's belief that

> [n]ot all 8–K filings regarding a company would trigger a duty on the part of a directed trustee to question a direction to purchase or hold securities of that company. Only those relatively few 8–Ks that call into serious question a company's *ongoing viability* may trigger a

---

**23.** This financial theory has been endorsed and applied by the federal courts. *See, e.g., Basic, Inc. v. Levinson,* 485 U.S. 224, 241–45,

108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. at 291.

duty on the part of the directed trustee to take some action.

*Id.* at n. 4 (emphasis supplied). The Bulletin also stresses that "[a] directed trustee's actual knowledge of media or other public reports or analyses that merely speculate on the continued viability of a company does not, in and of itself, constitute knowledge of *clear and compelling evidence* concerning the company sufficient to give rise to a directed trustee's duty to act." *Id.* at n. 5 (emphasis supplied).

Further clarifying the level of a company's extreme financial distress that the Department of Labor believes must exist before a directed trustee would have a duty to make further inquiry, the Bulletin distinguishes between circumstances where a company enters bankruptcy with a likelihood of a successful restructuring, and circumstances where a company enters bankruptcy with a likelihood of dissolving or of depriving stockholders of a recovery. It states,

> [f]or example, if a company filed for bankruptcy under circumstances which make it unlikely that there would be any distribution to equity-holders, or otherwise publicly stated that it was *unlikely to survive the bankruptcy proceedings* in a manner that would leave current equity-holders with any value, the directed trustee would have an obligation to question whether the named fiduciary has considered the prudence of the direction.

*Id.* (emphasis supplied). The Department notes, however, that even in the case of a distressed company in bankruptcy, it might not be imprudent for a directed trustee to follow a direction to purchase or hold stock in that company: "There may be situations in which the plan's fiduciaries could reasonably conclude that the stock investment makes sense, even for a long-term investor, in light of the proposed restructuring of the company's debts or other factors." *Id.* at n. 6.

The Department of Labor also discusses the situation where a corporate plan fiduciary instructs the directed trustee to purchase stock in the fiduciary's own company, and that company is encountering public scrutiny from regulatory or law-enforcement agencies. It opines that the existence of an investigation does not require a directed trustee to conduct an independent assessment of the prudence of the investment, but that the existence of formal charges may. The Bulletin states that

> in situations where a fiduciary who is a corporate employee gives an instruction to buy or hold stock of his or her company subsequent to *the company, its officers or directors, being formally charged by state or Federal regulators with financial irregularities,* the directed trustee, taking such facts into account, may need to decline to follow the direction or may need to conduct an independent assessment of the transaction in order to assure itself that the instruction is consistent with ERISA.

*Id.* (emphasis supplied). It warns that "[n]othing in the text should be read to suggest that a directed trustee would have a heightened duty whenever a regulatory body opens an investigation of a company whose securities are the subject of a direction, merely based on the bare fact of the investigation." *Id.* at n. 7.

Having considered the prevailing law regarding the scope of an ERISA fiduciary's duties, *see, e.g., In re WorldCom, Inc. ERISA Litig.,* 263 F.Supp.2d at 757–58, 761–62, the statutory imposition of such duties only "to the extent" a person functions as a fiduciary, 29 U.S.C. § 1002(21)(A), the limited discretion allowed "directed" trustees under Section 403(a), the standard of knowledge for co-

fiduciary liability contained in Section 405(a), and the Department of Labor's careful and persuasive analysis in the Bulletin, including its thoughtful articulation of the policies underlying its analysis, it is possible to describe the standard that applies to trustees when they receive directions to invest in particular securities. The choice of investment options remains in the hands of the named investment fiduciary. A directed trustee has no duty to investigate the wisdom of those choices or any obligation to render advice regarding the choices.

When a directed trustee receives a direction to invest plan assets in the securities of a company, or when plan assets are already invested in such securities, a directed trustee has a fiduciary duty of inquiry under ERISA when it knows or should know of reliable public information [24] that calls into serious question the company's short-term viability as a going concern.[25] Knowledge that a company's fortunes are declining does not impose a duty of inquiry. For instance, a directed trustee's knowledge that a company's "stock price and profits were declining and that the company was undergoing a restructuring" is not sufficient to find a breach of a fiduciary duty where the trustee continued to invest plan funds in the company's stock as directed. *Lalonde v. Textron, Inc.*, 369 F.3d 1, 7 (1st Cir.2004). *See also Wright*, 360 F.3d at 1098 (applying "brink of collapse" standard to directed trustee of employee stock ownership plan). Similarly, knowledge of a government investigation of a company, including an investigation into the reliability of its financial statements, or the filing of private lawsuits against a company, does not impose a duty of inquiry. Such a duty may arise when formal civil or criminal charges have been filed by government bodies, depending on the nature of the formal charges.

■ Applying this standard, Merrill Lynch is entitled to summary judgment. The plaintiffs have not shown that there are questions of fact as to whether reliable public information existed that called into serious question the short-term viability of WorldCom as a going concern. Although WorldCom's financial fortunes appeared to be declining, particularly from January to June 2002, its decline was not generally out of step with the other large companies in its industry. Analyst recommendations to sell WorldCom securities do not represent reliable information regarding the company's viability.[26] WorldCom's April

---

**24.** The plaintiffs do not contend that Merrill Lynch had possession of non-public information regarding WorldCom's manipulation of its financial statements. This Opinion will not further address, therefore, the parameters of a directed trustee's duty when in possession of non-public information.

**25.** This standard differs from the Department of Labor's opinion as expressed in the Bulletin in two respects. First, rather than describing the necessary public information as "clear and compelling," this standard requires that it be "reliable." This is because in addition to possessing content that raises "serious" questions—a requirement that already captures the compelling nature of the content—the information must also appear to be accurate and trustworthy in order to generate a directed trustee's duty of inquiry. Second, this standard specifies that the time frame at issue in assessing a company's prospects for ongoing viability is the "short-term." This requirement emphasizes that public indicators must disclose an imminent collapse, as opposed to long-term indicators that could, for example, forecast a company's future obsolescence.

**26.** During this time, sophisticated investors including numerous large public pension plans continued to hold and purchase millions of shares of WorldCom stock, and Merrill Lynch's own mutual funds purchased millions of WorldCom shares from January to June 2002, at a time when some believed its stock to be undervalued.

19, 2002 revised earnings announcement did not contain the type of fundamental perspective-shifting information that would disclose the impending collapse of the company. That kind of information did not appear until June 25 at the earliest, when the company made its stunning announcement of the need to restate its financial statements. Although the SEC had initiated an inquiry into WorldCom in March, the SEC did not bring formal charges against WorldCom during the Class Period. Although the plaintiffs have not emphasized this fact, they do refer to Walker's stated belief on May 22 that WorldCom faced a 30% chance of being sold or going bankrupt. Walker's speculation is not reliable public information that either event would occur, much less reliable information that WorldCom would cease functioning as a going concern. The plaintiffs have not shown, taking these facts singly or together, that there is sufficient evidence to permit a jury to find that on either March 13, or April 24, or at any time before June 25, 2002, there was reliable public record information that called into serious question WorldCom's ongoing viability, much less its imminent collapse. The plaintiffs' argument relies excessively on wisdom gained in hindsight.

The plaintiffs argue that there are material issues of fact that must be resolved at trial for two remaining reasons: (1) based on its experience working with WorldCom, Merrill Lynch had no reasonable basis to believe that WorldCom was fulfilling its fiduciary obligation to review the prudence of the Plan's investment in WorldCom; and (2) a fiduciary expert retained by the plaintiffs demonstrates that Merrill Lynch did not fulfill its fiduciary duties.

First, plaintiffs argue that Merrill Lynch was aware through its working relationship with WorldCom that any significant decision regarding the Plan was made with Merrill Lynch's input, and that Merrill Lynch had no reason to believe that WorldCom ever undertook a review of the prudence of holding company stock in the Plan. As an initial matter, the Amended Complaint does not allege that Merrill Lynch violated Section 405(a) by failing to remedy another fiduciary's breach of ERISA. Unless the plaintiffs can show that Merrill Lynch knew or should have known that an investment in WorldCom securities was imprudent, under the standard set forth in this Opinion, then its understanding of WorldCom's performance of its fiduciary functions is beside the point.

In any event, the plaintiffs have not shown that Merrill Lynch understood in 2002 that WorldCom was not reviewing the prudence of offering its employees the option of investing in company securities, and have not presented sufficient evidence to raise questions of fact in this regard. As a directed trustee, Merrill Lynch was under no duty, of course, to investigate the manner in which WorldCom administered the Plan, and had no duty to inquire whether WorldCom was undertaking prudence reviews of the Plan's holdings. The undisputed evidence is that Merrill Lynch provided copious amounts of financial data to WorldCom Plan officials, and plaintiffs have provided no reason why Merrill Lynch should have assumed that WorldCom officials ignored that data. In addition, Merrill Lynch fielded pointed questions from WorldCom in 2002 about post-Enron compliance issues and the wisdom of holding company stock in 401(k) plans. The undisputed record in this regard does not present questions of fact—from the perspective of the information available to Merrill Lynch—regarding WorldCom's review during this critical period of the prudence of holding company stock in the Plan. Although there is a question of fact as to whether WorldCom had a formal, written investment policy during the Class

Period,[27] the issue is immaterial. Even assuming no investment policy existed, which would violate a term of the Plan, and assuming Merrill Lynch was aware that no policy existed, there is no evidence that Merrill Lynch's knowledge that there was no formal investment policy also led Merrill Lynch to understand that World-Com was not reviewing the prudence of offering company stock through the Plan in the first half of 2002.

Second, through the use of the expert testimony of Lucian Morrison, the plaintiffs seek to prove that Merrill Lynch's fiduciary duties obligated it to take several actions which it failed to take with respect to WorldCom's stock and MCI tracking stock. The report never contends that the publicly available information regarding WorldCom before June 25, 2002 was sufficient to raise serious doubts about the company's ongoing viability. The report does not provide analytical support for the milepost dates it sets as the trigger dates for directed trustee action, other than to refer in general terms to the professional judgment of the author. Ultimately, nothing contained in the expert report raises a material and disputed issue of fact that would require resolution by a factfinder.

In sum, the plaintiffs have not shown that this is one of those rare cases in which a directed trustee had a duty under ERISA to investigate whether the continued investment of Plan assets in company stock was imprudent. The publicly available information regarding WorldCom did not create at any time before June 25, 2002, a reliable picture of serious concerns regarding the short-term viability of WorldCom.

27. For example, Miller testified that she was unaware of a WorldCom investment policy during the Class Period, and Eckert suggested the development of such a policy, but in Janu-

## CONCLUSION

Merrill Lynch's summary judgment motion is granted. The plaintiffs' motion for partial summary judgment is denied as moot.

SO ORDERED.

ary 2002, Dixon questioned whether "World-Com's investment policy couldn't use some brushing up."